UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

JAMES SHATTUCK,                                )
                                               )
                    *Plaintiff,*               )
                                               )
            vs.                                )        No. 2:19-cv-00428-JMS-MJD
                                               )
MIKE ANDERSON, ROBERT DECKER, JERRAD           )
PIRTLE, MELISSA PHERSON, ASHLEY HILL, and      )
VIGO COUNTY SHERIFF,                           )
                                               )
                    *Defendants.*              )

## **ORDER**

Plaintiff James Shattuck brings this action against: (1) the Vigo County, Indiana Sheriff, in his official capacity; (2) three employees of the Vigo County Sheriff's Department—Lieutenant Mike Anderson, Deputy Robert Decker, and Deputy Jerrad Pirtle—in their individual capacities ("the Vigo County Defendants"); and (3) Indiana Department of Child Services ("DCS") employees Melissa Pherson and Ashlea Hill[1] in their individual capacities ("the DCS Defendants").  Mr. Shattuck asserts that his constitutional rights were violated when the Vigo County Defendants and the DCS Defendants (collectively, "the Individual Defendants") forcibly entered his home without his consent and without a warrant and then remained in the home for approximately 45 minutes to interview his five-year-old daughter.  Mr. Shattuck has now filed a Motion for Partial Summary Judgment, [Filing No. 65], and Defendants have filed a Cross-Motion for Summary Judgment, [Filing No. 71].  Mr. Shattuck has also filed a Motion for Leave to File

---

[1] Counsel for Plaintiff represents that Ms. Hill's first name has been misspelled in various pleadings in this litigation.  [Filing No. 67 at 12 n.2.]  Accordingly, the Clerk is **DIRECTED** to update the docket to correct Ms. Hill's first name from "Ashley" to "Ashlea."

Short Surreply Brief in Opposition to Defendants' Motion for Summary Judgment. [Filing No. 78.] All three motions are ripe for the Court's review.

## I.
### SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail" on summary judgment. *Id.* at 648.

# II.
## STATEMENT OF FACTS

The Court notes at the outset that several important facts are disputed by the parties.  [*See* Filing No. 67 at 9-10 n.1 (Mr. Shattuck describing the disputes); Filing No. 77 at 2 (Defendants conceding that several material facts are in dispute).]   Accordingly, the following factual background is set forth pursuant to the standards outlined above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented and considered with respect to each motion in the light most favorable to "the party against whom the motion under consideration is made."  *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).  However, "[w]hen the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016).

### A.  Events Preceding the July 17, 2019 Incident

At all relevant times, Mr. Shattuck resided in a single-family home in Terre Haute, Indiana with his wife, Alicia Shattuck,[2] and their daughter, S.S.  [Filing No. 65-5 at 1.]  In July 2019, when the events giving rise to this lawsuit took place, S.S. was five years old.  [Filing No. 65-5 at 1.] Alicia's work schedule at that time was unpredictable, and Mr. Shattuck operated an automobile repair and restoration business out of the family's home, so he had primary caretaking responsibilities for S.S.  [Filing No. 65-6 at 1.]

Sometime in 2014, a report was made to DCS alleging that Mr. Shattuck had sexually abused his stepdaughter, M.V., who is S.S.'s older half-sister and was 15 or 16 years old at the

---

[2] To avoid confusion, the Court will refer to Alicia Shattuck by her first name only.

time.  [Filing No. 65-6 at 1; Filing No. 74-2 at 5.]  An investigation was conducted by DCS and the Vigo County Sheriff's Department, resulting in criminal charges being filed against Mr. Shattuck.  [Filing No. 65-5 at 1-2.]  Ultimately, the charges were dismissed "after the alleged victim recanted and admitted that [Mr. Shattuck] did not commit the offenses with which [he] was charged."  [Filing No. 65-5 at 2.]  Mr. Shattuck maintains that he never sexually abused M.V. and states that "the ordeal was incredibly scarring, tarnished [his] reputation irreversibly, and caused [him] to be extremely suspicious of the motives of both DCS and the Vigo County Sheriff's Office."  [Filing No. 65-5 at 2.]  According to Mr. Shattuck, the false report was made by his two adult stepsons (who are M.V's older brothers and S.S.'s half-brothers), who were angry because Mr. Shattuck had cut them off financially.  [Filing No. 74-2 at 5.]

On July 11, 2019, DCS received a phone call from one of Mr. Shattuck's stepsons, who is identified in DCS documentation as the "Report Source" or "RS."  [Filing No. 65-6 at 5-6.]  The Report Source followed up his initial call with an email on July 12, 2019.  [Filing No. 65-6 at 5.]

The Report Source informed DCS of the prior allegations made against Mr. Shattuck in 2014 and stated his belief that the victim in the prior case was pressured into recanting.  [Filing No. 74-1 at 1.][3]  The Report Source also alleged that Mr. Shattuck had previously been "on the sex offender registry," but had been removed within the preceding year, and that Mr. Shattuck had "served a year in jail at one point."  [Filing No. 74-1 at 1.]  The Report Source stated that "there

[3] Some of the DCS records filed as exhibits to Ms. Pherson's deposition, which were included as a part of Mr. Shattuck's evidence in support of his Partial Motion for Summary Judgment, were filed in a format that was difficult to read because of the small font size and the poor quality of the scans.  [See Filing No. 65-6 at 20-46.]  Mr. Shattuck acknowledged this problem and submitted clearer, more easily readable versions of the same documents along with his Response in Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of his Motion for Partial Summary Judgment.  [Filing No. 74 at 1 n.1; Filing No. 74-1.]  Defendants did not object to the re-filed documents.  [See Filing No. 77.]  Where applicable, the Court will cite only the later-filed, readable versions of the relevant documents.

was concern" regarding S.S. and that he had "a couple different 'gut uncomfortable feelings.'"
[Filing No. 74-1 at 1.] Specifically, the Report Source noted that Mr. Shattuck worked from home,
S.S. was home with Mr. Shattuck "60 to 80% of the time," and S.S. and Mr. Shattuck "have secrets
between each other," including one "secret" involving Mr. Shattuck's desire to homeschool S.S.
[Filing No. 74-1 at 1.] The Report Source also stated that, at a wedding rehearsal dinner in
December 2018, S.S. "would not stop trying to hug, kiss, and change another little girl's diaper."
[Filing No. 74-1 at 1.] The other little girl was a family member who was approximately the same
age as S.S., and according to the Report Source, the situation "was so uncomfortable that the family
members left the dinner with [the child]." [Filing No. 74-1 at 1.] The Report Source stated that
the family believed that S.S. was trying to hug and kiss the other child because Mr. Shattuck
"constantly asks for hugs and kisses from [S.S.]," and as a result, S.S. "has no boundaries of
hugging and kissing people." [Filing No. 74-1 at 1.] The Report Source stated that he believed
that Mr. Shattuck was attempting to isolate S.S., and that S.S. would report back to Mr. Shattuck
whenever she had a conversation with anyone else about anything. [Filing No. 74-1 at 1.] The
Report Source stated that S.S. had not made any allegations or reports of sexual abuse. [Filing No.
74-1 at 1.] The last time that the Report Source saw S.S. was at the wedding rehearsal in December
2018. [Filing No. 74-1 at 15.]

The DCS report concerning the Report Source's allegations states: "This report is
recommended to be screened out." [Filing No. 74-1 at 1.] When a report is screened out, that
means DCS has determined "that the complaint does not even warrant an assessment." [Filing No.
65-6 at 4.] The Report Source's complaint was initially "screened out" by both the central DCS
office and the Vigo County DCS office. [Filing No. 65-6 at 5.] Nevertheless, on July 15, 2019,
the complaint was ultimately "screened in" and assigned to Ms. Pherson, a DCS family case

manager, for investigation.  [Filing No. 65-6 at 5-6.]  Ms. Pherson then contacted the Report Source

by phone on July 15.  [Filing No. 65-6 at 6-7.]  Ms. Pherson testified that she did not have any

prior interactions with Mr. Shattuck and was not involved in any investigation of him or his family

prior to the investigation resulting in the incident underlying his lawsuit, but while investigating

this matter, she did review Mr. Shattuck's DCS history and criminal history and speak with other

DCS employees who were involved in the prior investigation.  [Filing No. 65-6 at 4; Filing No.

65-6 at 7.]  The decision was made to go to Mr. Shattuck's home to interview S.S., and because

the Report Source had indicated that Mr. Shattuck might be hostile or aggressive towards DCS,

Ms. Hill accompanied Ms. Pherson on the visit.  [Filing No. 65-6 at 7.]

**B.  The DCS Defendants' Arrival at the Shattucks' Residence**

Ms. Pherson and Ms. Hill arrived at Mr. Shattuck's residence on July 17, 2019 at

approximately 3:15 p.m.  [Filing No. 65-5 at 2; Filing No. 65-6 at 7-8; Filing No. 65-6 at 11.]

Many significant details concerning what transpired during the visit are disputed by the parties.

According to Ms. Pherson, upon arriving at the residence, she and Ms. Hill approached the

door and knocked several times.  [Filing No. 65-6 at 8.]  Ms. Pherson stated that she heard a female

child's voice inside the house say "something about 'Mommy,'" although she could not make out

exactly what was said.  [Filing No. 65-6 at 8.]  Ms. Pherson testified that the speaker was not

"screaming out in distress or anything," but instead "just spoke like a normal person would have a

conversation."  [Filing No. 65-6 at 8.]  Ms. Hill also testified that, after the first or second knock

on the door, she and Ms. Pherson "heard what [they] believed was a female child's voice say

something about 'Mommy' or 'Mommy being home, coming home,' something along the lines of

that."  [Filing No. 65-7 at 3.]  Ms. Pherson stated that she did not hear anything else inside the

house, but she knocked on the door again and no one answered.  [Filing No. 65-6 at 8.]  According

to Ms. Hill, she and Ms. Pherson knocked several times and announced that they "needed an adult to come to the door," but no one answered, and they did not hear any additional sounds coming from inside the house.  [Filing No. 65-7 at 3.]

Mr. Shattuck disputes this version of events.  In his affidavit, Mr. Shattuck avers that he and S.S. were sitting at their kitchen table when he saw the DCS employees walking up the driveway toward his front door and, given his past experience with the agency, he "did not want to open the door or to speak with them." [Filing No. 65-5 at 2.]  Accordingly, he states, he gestured to S.S. to remain quiet, and the two of them hid in a back room of the house.  [Filing No. 65-5 at 2.]  Mr. Shattuck asserts that he "understand[s] that various defendants have indicated that they heard the voice of a female child prior to forcing entry into [his] home."  [Filing No. 65-5 at 2.] However, he avers: "This is not true:  S.S. remained quiet the entire time, and there was no other noise that might have been mistaken for the voice of a female child."  [Filing No. 65-5 at 2.] During his deposition, Mr. Shattuck gave substantially the same account of the events as stated in his affidavit.  [Filing No. 74-2 at 3-4.]

According to Ms. Pherson, because no one answered the door, she and Ms. Hill returned to their car and Ms. Pherson called her supervisor to ask how they should proceed.  [Filing No. 65-6 at 8.]  The supervisor advised Ms. Pherson to contact law enforcement, and so she contacted the Vigo County Sheriff's Office central dispatch.  [Filing No. 65-6 at 8.]  Ms. Pherson testified that she relayed to the dispatcher that they believed that S.S. was inside the home alone and no one was coming to the door.  [Filing No. 65-6 at 9.]

### C.  The Vigo County Defendants' Arrival at the Shattucks' Residence

Deputy Robert Decker was the first of the Vigo County Defendants to respond to the scene at approximately 3:34 p.m.  [Filing No. 65-6 at 9; Filing No. 65-8 at 4; Filing No. 65-8 at 15.]  He

testified that he was initially under the impression that Mr. Shattuck was home with the child and was not coming to the door, based on the fact that he "wouldn't think that somebody would leave a 5-year-old home alone" and the fact that there was a vehicle in the driveway that he learned was registered to Mr. Shattuck. [Filing No. 65-8 at 4.] Deputy Decker testified that he spoke to a neighbor who was not sure whether anyone was home at the Shattucks' house, but expressed that the Shattucks had two vehicles and one was not there. [Filing No. 65-8 at 5.] According to Ms. Pherson, she explained to Deputy Decker that she was there to investigate allegations concerning S.S., and that she believed she heard S.S. inside the home but no one answered the door. [Filing No. 65-6 at 10; Filing No. 65-8 at 4-5.]

Deputy Decker knocked several times, identified himself, then walked around the perimeter of the house, shining his light into windows and knocking on the sliding glass patio door. [Filing No. 65-6 at 11; Filing No. 65-8 at 4.] Deputy Decker testified that he heard what he believed to be a child's voice "while [he] was walking around the residence." [Filing No. 65-8 at 4.] He stated that he "couldn't really make out what the child's voice said, but [he] could definitely tell that a child was speaking" and that the voice "was loud enough to go through a wall." [Filing No. 65-8 at 4.]

Again, Mr. Shattuck disputes that Deputy Decker could have heard a voice. [Filing No. 65-5 at 2.] In addition, at some point, Mr. Shattuck called his parents and asked them to come to his house because he wanted them to witness his encounter with DCS and law enforcement. [Filing No. 74-2 at 6.] Sometime prior to the Individual Defendants' entry into the home, Mr. Shattuck's parents arrived at the scene. [Filing No. 65-5 at 3.]

Sometime thereafter, Lieutenant Mike Anderson arrived at the scene. [Filing No. 65-8 at 5.] Lieutenant Anderson is a family friend of Mr. Shattuck's and has known Mr. Shattuck for most

of his life.  [Filing No. 65-9 at 3.]  Lieutenant Anderson testified that he and Deputy Decker approached the door, and Lieutenant Anderson knocked and looked in the front windows of the house.  [Filing No. 65-9 at 5.]  According to Lieutenant Anderson, he announced himself and assumed that, if Mr. Shattuck was inside, he would answer the door if he knew that it was Lieutenant Anderson knocking, given their prior relationship.  [Filing No. 65-9 at 5.]  However, Lieutenant Anderson did not see or hear anyone inside the house.  [Filing No. 65-9 at 5; Filing No. 65-9 at 7.]

Deputy Decker used his police radio to contact dispatch and request that the fire department be dispatched to the scene, stating to the dispatcher: "per [Lieutenant Anderson], get ahold of the fire department, send 'em out here, knock this door down."  [Filing No. 65-1 at 1:11-1:22.] According to Lieutenant Anderson, a few firefighters responded to the scene.  [Filing No. 65-9 at 6.]  However, Deputy Decker testified that no one from the fire department ever arrived.  [Filing No. 65-8 at 6.]

### D. Initial Call to Prosecutor Rob Roberts

Lieutenant Anderson directed Deputy Decker to call Rob Roberts, the Chief Deputy Prosecutor for Vigo County.  [Filing No. 65-8 at 5; Filing No. 65-9 at 4; Filing No. 65-9 at 7; Filing No. 65-11 at 2.]  According to Deputy Decker, he told Mr. Roberts that he and the DCS Defendants believed that there was a child inside the residence and no adult had answered the door, which led them to believe that the child was unsupervised.  [Filing No. 65-8 at 6.]  Deputy Decker does not recall if he told Mr. Roberts that there was a vehicle in the driveway that was registered to Mr. Shattuck, [Filing No. 65-8 at 7], but Lieutenant Anderson testified that the Vigo County Defendants had learned this information prior to calling Mr. Roberts, [Filing No. 65-9 at 5.] Similarly, Ms. Pherson testified that she informed Mr. Roberts that she was investigating

allegations of sexual abuse concerning S.S. and relayed "the history of what [she] knew about Mr. Shattuck, what [her] concerns were with the actual original report," and that she believed that S.S. was home alone because she heard S.S. speak but no adult came to the door.  [Filing No. 65-6 at 13-14.]

Mr. Roberts, however, testified that he was not aware of the nature of the complaint against Mr. Shattuck that precipitated the DCS investigation, so that information did not play a role in his legal advice.  [Filing No. 65-11 at 5.]  In his deposition, he gave the following description of the facts presented to him during the phone call:

> My understanding was at the time that they had been asked to assist DCS in a follow-up investigation to a report that they had received involving -- I believe it was a 5-year-old girl, and they were out at the house.  They had knocked on the door multiple times. They had heard what they believed to be a small child inside of the house, but they were not able to get anyone to answer the door and that while they'd heard the small child moving around for a period of time, they no longer heard any movement coming from inside the house, and that's when I was told they called me.

[Filing No. 65-11 at 4.]  Regarding the advice he gave, Mr. Roberts testified:

> [B]oth through case law as well as through practical experience on previous cases, I felt that they had exigent circumstances given the fact that they had heard the movement, no longer heard any movement, leading them up to have a reasonable belief that there was somebody in there consistent with the reporting that they believed it was a small child; that that was enough for them to at that time make entry to under exigent circumstances to guarantee the safety and well-being of the person that they heard moving around in there.

[Filing No. 65-11 at 4.]

Both Deputy Decker and Ms. Pherson testified that they understood Mr. Roberts' determination to be that there were exigent circumstances and they could enter the house without a warrant to check on the welfare of the child inside.  [Filing No. 65-6 at 14; Filing No. 65-8 at 8.] Ms. Pherson testified that in the discovery documents, she referred to Mr. Roberts' verbal permission to enter the home as a "verbal access order."  [Filing No. 65-6 at 14.]  When asked

during his deposition whether he believed that Mr. Roberts granted Defendants a "verbal access order" to enter the home, Deputy Decker said: "in my entire career I have never heard that terminology." [Filing No. 65-8 at 8.]

At some point after Deputy Decker called Mr. Roberts, but before the Individual Defendants entered the house, Deputy Jerrad Pirtle also arrived at the scene. [Filing No. 65-8 at 5; Filing No. 65-9 at 4.]

### E. Ms. Pherson Contacts Alicia Through the Report Source

While waiting outside the Shattucks' house, Ms. Pherson contacted the Report Source and asked him to contact Alicia and tell her to come home. [Filing No. 65-6 at 11.] Ms. Pherson did not ask the Report Source to contact Mr. Shattuck nor did she ask him for Mr. Shattuck's contact information. [Filing No. 65-6 at 11.] Ms. Pherson did not make any attempts to contact Mr. Shattuck directly. [Filing No. 65-6 at 11.] The Report Source called Ms. Pherson back to advise that Alicia was on her way home and would arrive within 20 minutes. [Filing No. 65-6 at 15.]

### F. Second Contact with Mr. Roberts

Deputy Decker testified that, after speaking to Mr. Roberts the first time, he learned that Alicia was on her way home, so he called Mr. Roberts a second time to "explain this to him." [Filing No. 65-8 at 7-8.] Mr. Roberts does not recall receiving a second phone call until after the incident was over and law enforcement had left the Shattucks' residence, [Filing No. 65-11 at 7], but when asked if he was aware that Alicia was on the scene before entry, Mr. Roberts testified: "I don't think that I learned that she was there during the phone call. I think at some point in time I was told that she was -- that they believed she was on her way," [Filing No. 65-11 at 4].

According to Deputy Decker, Mr. Roberts advised during the second call that if Alicia did not open the door, the officers could force entry into the house as initially instructed. [Filing No. 65-8 at 8.] However, Mr. Roberts testified as follows regarding Alicia's potential presence:

> **Q**: Did you tell them anything about what the wife's presence would mean?
>
> **A**: I did not because I -- again, when I gave them the advice, and under that situation I didn't assume that they were going to wait for somebody to get there at some future point in time. Under an exigent circumstance, I believe that it's in that moment that they have the exigent circumstance that they can make that entry, and that's what I told them.
>
> **Q**: So your advice did not depend on whether the wife showed up, the mom?
>
> **A**: No, no.
>
> ***
>
> **Q**: Did the wife's presence or potential presence play any role in the advice that you gave?
>
> **A**: Because she was not there at the time, it did not.

[Filing No. 65-11 at 5.] Mr. Roberts stated that he was not called in the time between Alicia's arrival and the officers' entry. [Filing No. 65-11 at 5.]

### G.  Alicia Arrives at the Scene

Sometime after the contact with Mr. Roberts, but before the Individual Defendants entered the Shattucks' home, Alicia arrived at the scene. [Filing No. 65-6 at 14-15.] Deputy Decker testified that when Alicia arrived, "she completely ignored [the officers and the DCS workers], jumped on her cell phone and started walking away from the residence, which led [them] to further believe that there in fact was a child in the residence and quite possibly home alone." [Filing No. 65-8 at 7.] According to Ms. Pherson, when Alicia arrived, she called Mr. Shattuck on the phone and then "started yelling at [the DCS employees] that the officers could not enter the home without a warrant." [Filing No. 65-6 at 15; *see also* Filing No. 65-6 at 15 ("[S]he was screaming at all of

us that they couldn't go in the house without a warrant.").] Deputy Pirtle testified that Alicia was "ignoring anybody that was trying to talk to her and walking up the road" away from the house. [Filing No. 65-10 at 4.]

When asked if Alicia had given the officers consent to enter the home, Deputy Decker testified that "[s]he didn't not give consent or give consent." [Filing No. 65-8 at 8.] However, he later acknowledged that Alicia stated that she would not let anyone talk to S.S. unless they had "court papers." [Filing No. 65-8 at 9.] Lieutenant Anderson also testified that Alicia indicated that no one could speak with her daughter without a court order. [Filing No. 65-9 at 9.] He stated that Alicia did not say or do anything to indicate to him that he had her consent to enter the house. [Filing No. 65-9 at 9.] Deputy Pirtle interpreted Alicia's actions as a refusal to let anyone into the house. [Filing No. 65-10 at 4.]

**H. Entry into the Shattucks' Home**

At approximately 4:20 p.m., the Individual Defendants entered the Shattucks' home. [Filing No. 65-5 at 3.] According to Deputy Decker, he knocked and announced himself one final time and did not receive a response, so he kicked in the Shattucks' door. [Filing No. 65-8 at 11.] Ms. Pherson testified that "right after [Deputy] Decker gave the 30-second warning; basically, as he was in the process of kicking the door in, someone yelled something" from inside. [Filing No. 65-6 at 16.] She stated that the voice belonged to an adult male. [Filing No. 65-6 at 16.]

Mr. Shattuck testified that before the Individual Defendants entered his home, he "was talking to them through the door, hollering through the door, and they weren't talking to [him]." [Filing No. 74-2 at 7; *see also* Filing No. 65-5 at 2 (Mr. Shattuck's affidavit stating that he "asked [the officers] through the front door whether they had a warrant to enter [his] home").] Mr. Shattuck testified that he asked the law enforcement officers if they had a warrant or court order,

to which someone responded, "Open the door because the fire department is on their way to force entry." [Filing No. 74-2 at 7.]  According to Mr. Shattuck, he stated that he would open the door if the officers had a warrant or court order, to which a second person outside responded that Mr. Shattuck had seconds to open the door before it would be broken down.  [Filing No. 74-2 at 7; *see also* Filing No. 65-6 at 3 (Mr. Shattuck's affidavit stating that "at the very least, [he] spoke with two officers from the Vigo County Sheriff's Office *before* entry into [his] home was forced" (emphasis in original)).]  Mr. Shattuck testified that he was on the phone with Alicia at the time, and through the door he could also hear her telling the Individual Defendants that they could not enter the home without a warrant.  [Filing No. 74-2 at 7.]

The front door of the Shattucks' residence opens directly into the living room.  [Filing No. 65-8 at 11.]  According to Ms. Pherson, "[a]s soon as the door was kicked in," she saw Mr. Shattuck standing in the living room, and therefore became aware that there was an adult inside the home. [Filing No. 65-6 at 16.]  She testified that she entered the house nonetheless because she "could not physically see" S.S. immediately.  [Filing No. 65-6 at 16.]  Deputy Decker and Lieutenant Anderson also testified that they saw Mr. Shattuck in the living room as soon as they broke down the door.  [Filing No. 65-8 at 11; Filing No. 65-9 at 10.]  Deputy Decker stated that, once inside the house, he believed it was his job as a law enforcement official to confirm that S.S. was safe, given the nature of the allegations against Mr. Shattuck and his previous arrest for allegations of child abuse.  [Filing No. 65-8 at 11.]

## I.  Events Occurring Inside the House Following Defendants' Entry

As all of the Individual Defendants entered the home, Deputy Decker retrieved S.S. from a back room of the house and Deputy Pirtle patted Mr. Shattuck down to check for a weapon. [Filing No. 65-6 at 16; Filing No. 65-8 at 12; Filing No. 65-10 at 5; Filing No. 74-2 at 8.]  At this

time, the Individual Defendants, Mr. Shattuck, Mr. Shattuck's parents, Alicia, and S.S. were all present in the living room. [Filing No. 65-5 at 3-4.]  Although S.S. "appeared scared," she was fully clothed, not injured, and appeared to be physically healthy.  [Filing No. 65-6 at 17.]  Mr. Shattuck testified that he was "irate" when the Individual Defendants entered his house.  [Filing No. 74-2 at 8.]  In his affidavit, he stated that he "recall[s] yelling repeatedly that the officials had no right to enter [his] home without a warrant or court order." [Filing No. 65-5 at 4.]

Shortly after the Individual Defendants' entry, Mr. Shattuck started recording on his cell phone.  [Filing No. 65-8 at 12; Filing No. 74-2 at 8.]  Although the two videos of the encounter speak for themselves, the Court will summarize the relevant portions.  The first video shows Mr. Shattuck asking Deputy Decker and Deputy Pirtle for their names and badge numbers.  [Filing No. 65-2 at 0:00-0:10.]  Ms. Pherson can be heard saying, "I need to speak with the child. . . . I just need to talk to [S.S.]." [Filing No. 65-2 at 0:10-0:14.]  Alicia started to ask, "Do you want to talk to her by yourself or do you –" before Mr. Shattuck interrupted, shouting:

> No, they're not talking to her by herself.  You are not talking to her by herself, you manipulating piece of trash people. You're not talking to my child by yourself. They wanna take her out by theirself, you're not talking to my kid by herself.  You ain't, he ain't, he ain't, and she ain't. Quit mad-dogging me.

[Filing No. 65-2 at 0:20-0:40.]

Alicia asked Mr. Shattuck to calm down.  [Filing No. 65-2 at 0:40-0:48.]  Speaking over Alicia, Lieutenant Anderson said, "We got an oral order," to which Mr. Shattuck responded, "You gotta have it in writing and show me!" [Filing No. 65-2 at 0:48-0:50.]  The following exchange ensued:

**Lt. Anderson**: We don't have to have it in writing.

**Mr. Shattuck**: Yes you do.

**Lt. Anderson**: Okay, well, you wanna call Rob Roberts and he'll tell you that?

**Mr. Shattuck**: I ain't calling nobody.

16

**Lt. Anderson**: Well don't call nobody.

**Mr. Shattuck**: You just illegally broke into my house.

**Lt. Anderson**: Okay, we called him before we ever did it, Shaggy.[4]

**Mr. Shattuck**: You gotta present it to me.

**Lt. Anderson**: How you gonna present it with the door shut?

**Mr. Shattuck**: You gotta say "I got it" and I can see it – I can open the door and see it.

**Lt. Anderson**: You can do whatever you want [indecipherable].

**Mr. Shattuck**: I can't just take your word for it!

[Filing No. 65-2 at 0:48-1:10.]

Mr. Shattuck asked the Individual Defendants why they were at his home, to which Ms. Pherson responded, "We have allegations concerning [S.S.], that's why we need to meet with her." [Filing No. 65-2 at 1:16-1:22.] Mr. Shattuck asked who made the allegations, and Ms. Pherson explained that she could not reveal the identity of the Report Source without a court order. [Filing No. 65-2 at 1:21-1:26.] Mr. Shattuck shouted, "You don't even have a court order to be here!" to which Ms. Pherson responded, "Sir, they called the prosecutor on the phone and got an order." [Filing No. 65-2 at 1:26-1:33.]

Mr. Shattuck continued to ask about the allegations, and Ms. Pherson stated that she was not comfortable disclosing the allegations until after she spoke with S.S. [Filing No. 65-2 at 1:33-2:03.] Mr. Shattuck's father asked Ms. Pherson, "Can somebody be with you?" and Mr. Shattuck interjected, "Yes, 'cause she's a minor, she's five years old, they're not allowed to be by theirself with her." [Filing No. 65-2 at 2:04-2:09.] Lieutenant Anderson suggested that Mr. Shattuck let his father accompany S.S. to be interviewed, and Mr. Shattuck asked that his wife be able to join as well. [Filing No. 65-2 at 2:09-2:12.] Ms. Pherson explained that only one person was allowed

---

[4] Mr. Shattuck sometimes goes by the nickname "Shaggy." [Filing No. 65-9 at 3.]

to accompany S.S., and Mr. Shattuck said "Record everything, dad.  Record it."  [Filing No. 65-2 at 2:12-2:19.]  Then, over pleas from Alicia to "calm down" and from his father to "let them go," Mr. Shattuck said the following:

> Your agency needs to be closed! Do you have any idea how much harassment this is? You know what I've went through because of you people? You know everything that's been proven? Lies against me from you people. You know how much trouble you cops are in? You're all in so much trouble! Do you know what this is doing to me?! You know what I've went through? All the allegations people has charged me with? And it was proven they were lying. Proven! You destroyed my life, and I didn't do nothing wrong!

[Filing No. 65-2 at 2:24-2:52.]  Mr. Shattuck's father started to lead the DCS Defendants away from the living room, and Mr. Shattuck called after them: "They can go in the kitchen or something, they don't need to go through our house." [Filing No. 65-2 at 3:11-3:15.]  Ms. Pherson stated that she does not want to do the interview "where everyone can hear [them]," and so Mr. Shattuck's father led the DCS Defendants and S.S. to another room.  [Filing No. 65-2 at 3:15-3:25.]

As the interview with S.S. was ongoing, Mr. Shattuck explained to the Vigo County Defendants that he was "scared" because of the previous false allegations against him, which he characterized as "lies" that destroyed his life, and stated that is why he did not open the door. [See Filing No. 65-2 at 3:25-5:52.]  Mr. Shattuck talked about this for several minutes. [See Filing No. 65-2 at 3:25-7:05.]  Lieutenant Anderson asked, "You heard me out there, didn't ya?  I told – I announced my name probably ten times," to which Mr. Shattuck responded, "I – I peeked out the window and saw ya." [Filing No. 65-2 at 4:57-5:04.]  Lieutenant Anderson asked, "Why didn't you open the door for me?  I've known you all my life!" and Mr. Shattuck responded, "Because of what I just told you guys, I'm scared!" [Filing No. 65-2 at 5:04-5:09.]

Minutes later, as Mr. Shattuck continued to express his dissatisfaction with DCS and law enforcement, the following exchange took place:

**Lt. Anderson:** We ain't got nothin' to do with DCS.  When they come here, they call us, we have to go do whatever they gotta do.  That's why we called Rob Roberts in the prosecutor's office to see what to do.  He said, "If they don't open the door and you have heard somebody in there, kick the door in, fill out the paperwork, search warrant, no problem."

**Mr. Shattuck:** I was doin' what my attorney told me to do.  He said. "You don't see a warrant, don't open."

**Lt. Anderson:** But did you think they were just gonna walk away?

**Mr. Shattuck:** They should've.  Come back another day and knock on the door.

**Lt. Anderson:** No, because they didn't – they said they never heard an adult in here, so if they hear a kid in here –

**Mr. Shattuck:** They didn't hear her.  They didn't hear her.  When they showed up, I was sittin' in the kitchen.

**Lt. Anderson:** I don't know if they did or not.

**Mr. Shattuck:** She was eatin' macaroni.

**Lt. Anderson:** They said they did so, if they say they heard a kid in here and no adult, well, hell, we had the fire department come down here to open the door.  Fire department went back to the firehouse.  So, Rob Roberts said –

[Filing No. 65-2 at 7:30-8:03.] Mr. Shattuck continued to speak with the Vigo County Defendants about his distrust of law enforcement and other matters.  [Filing No. 65-2 at 8:03-12:58.]

Approximately 13 minutes into the video, Mr. Shattuck's father emerged after the interview with S.S. was complete and said, "Everything is fine."  [Filing No. 65-2 at 12:57-12:58.]  Mr. Shattuck responded, "I know it's fine," and then said to the DCS Defendants, "Now I want to know what in the f*** you're doin' here." [Filing No. 65-2 at 13:01-13:05.]  Mr. Shattuck's father indicated that he believed the DCS Defendants were just trying to protect S.S., to which Mr. Shattuck said, "No they're not.  Dad, don't be on their side! They're bad people!"  [Filing No. 65-2 at 13:12-13:20.]  Mr. Pherson then said, "I will talk to you if you can calm down.  I don't want to be screamed at."  [Filing No. 65-2 at 13:20-13:23.]  Mr. Shattuck asked if the DCS Defendants

were ever going to come back again, to which Ms. Pherson responded, "For this current situation, I think we're good, if you're going to speak to me calmly." [Filing No. 65-2 at 13:27-13:34.]

Mr. Shattuck then explained some of his prior history to Ms. Pherson, and she asked, "do you wanna talk, or not?" to which Mr. Shattuck responded, "Yeah, I wanna know why." [Filing No. 65-2 at 14:30-14:33.] Ms. Pherson agreed to speak to Mr. Shattuck and his father in another room, and Mr. Shattuck led Ms. Pherson, Ms. Hill, and his father into a bathroom so she Ms. Pherson could explain to him what allegations were made against him. [Filing No. 65-2 at 14:43-15:10.] That discussion lasted approximately ten minutes. [*See* Filing No. 65-2 at 15:10-24:35.]

During that discussion, Mr. Shattuck mentioned that he was hesitant because of the way he was treated by DCS and law enforcement in the past, and stated, in reference to the time when he saw the Individual Defendants outside his door, "he's hollerin' sayin' 'I got a warrant' and I'm like – I'm goin' to jail then." [Filing No. 65-2 at 18:30-18:46.] Ms. Pherson explained, "No. . . . The warrant was literally to get in your house, not because you were being arrested." [Filing No. 65-2 at 18:39-18:50.] Mr. Shattuck explained that he had been told by an attorney not to open the door without seeing a warrant, to which Ms. Pherson responded, "I mean, I don't know anything about that. I know we had the prosecutor on the phone." [Filing No. 65-2 at 18:48-19:09.]

After their conversation, Ms. Pherson went to her car to call her supervisor, and Mr. Shattuck remained in his living room, talking with the Vigo County Defendants. [Filing No. 65-2 at 24:30-33:45.] Ms. Pherson returned approximately ten minutes later and explained that she forgot to ask S.S. a particular question, so Mr. Shattuck's father accompanied S.S. and Ms. Pherson elsewhere to finish the interview. [Filing No. 65-2 at 33:45-35:09.] After approximately two minutes, Ms. Pherson returned to the living room and asked Mr. Shattuck and Alicia to sign a "safety plan" agreeing that they would immediately contact DCS and law enforcement in the event

that S.S. indicated to any family member that she was being sexually abused.  [Filing No. 65-2 at 35:33-38:48; Filing No. 65-3.]  The second video recorded by Mr. Shattuck ends after the safety plan was signed.  [See Filing No. 65-3 at 4:15-4:18.]  The Individual Defendants left Mr. Shattuck's home within a few minutes after the end of the recording.  [Filing No. 65-5 at 4.]  In total, the Individual Defendants were inside the Shattucks' residence for approximately 45 minutes.  [Filing No. 65-5 at 4.]

Ms. Pherson testified that Mr. Shattuck never asked her to leave his home, and that he engaged in conversation with her and allowed her to interview S.S. with Mr. Shattuck's father present.  [Filing No. 65-6 at 17.]  Ms. Pherson stated that if Mr. Shattuck had refused to allow her to interview S.S., she "would not have left the vicinity, but [she] would have went out of his front door . . . and called [her] supervisor."  [Filing No. 65-6 at 17.]  Ms. Hill also testified that she believed she had Mr. Shattuck's permission to be inside the home when he allowed them to interview S.S. in another room.  [Filing No. 65-7 at 5.]

Deputy Decker testified that there was nothing that Mr. Shattuck could have done to cause him to leave the home before the DCS Defendants could interview S.S.  [Filing No. 65-8 at 12.]  Lieutenant Anderson testified that there was "[p]robably not" anything Mr. Shattuck could have said that would have caused him to leave.  [Filing No. 65-9 at 10.]  Deputy Pirtle also stated there was nothing Mr. Shattuck could have done to cause him to leave.  [Filing No. 65-10 at 5.]  When asked if Mr. Shattuck was okay with the Individual Defendants being in his home, Deputy Pirtle stated: "I mean, he was very agitated.  I don't know if he was okay with us being there.  I don't ever remember him saying we need[ed] to leave, though."  [Filing No. 65-10 at 5.]

The interview with S.S. did not reveal any information that caused the DCS Defendants to be concerned about abuse.  [Filing No. 65-6 at 17.]  Ms. Pherson ultimately concluded that the Report Source's allegations against Mr. Shattuck were not substantiated.  [Filing No. 65-6 at 18.]

### J.   Physical Damage to the Shattucks' Home

The front door of the Shattucks' home consists of an oversized exterior door and an oversized storm door, each with a locking mechanism.  [Filing No. 65-5 at 4.]  Prior to the Individual Defendants forcing entry into the home, both doors and the door frame were in excellent condition.  [Filing No. 65-5 at 4-5.]  The forced entry caused damage to the locking mechanism of the storm door, the door jamb, and the door frame, which "shatter[ed] into pieces."  [Filing No. 65-5 at 5.]

Mr. Shattuck contacted Martin Hansen to inspect the door and prepare a quote indicating what it would cost to repair the damage.  [Filing No. 65-5 at 5.]  Mr. Hansen is a general contractor and the owner of Hansen Construction.  [Filing No. 65-12 at 1.]  He quoted Mr. Shattuck a price of $733.00 "to restore the door to full working order."  [Filing No. 65-12 at 1-3.]  According to Mr. Shattuck, the forced entry also damaged decorative elements on the exterior door, though those were not factored into the quote.  [Filing No. 65-5 at 5.]

### K.  Procedural History

In his Amended Complaint, Mr. Shattuck asserts that the DCS Defendants and the Vigo County Defendants violated his Fourth Amendment rights by: (1) entering his home; and (2) remaining in his home after the initial entry.  [Filing No. 32 at 6.]  Mr. Shattuck also asserts that the actions of the Vigo County Defendants constitute the torts of trespass, false imprisonment,

and intentional infliction of emotional distress[5] under Indiana law and that the Vigo County Sheriff is liable for these torts.  [Filing No. 32 at 6-7.]

Mr. Shattuck filed a Motion for Partial Summary Judgment ("Initial Motion"), in which he seeks summary judgment on the issue of Defendants' liability and an award of $2,199.00 in damages.  [Filing No. 65.]  He asserts that the remainder of his damages, including damages for emotional harm, must be resolved at trial.  [Filing No. 65 at 1.]  Defendants filed a Joint Cross-Motion for Summary Judgment and Response to Plaintiff's Partial Motion for Summary Judgment ("Cross-Motion/Response"), [Filing No. 71]; Mr. Shattuck filed a Response in Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of His Motion for Partial Summary Judgment ("Response/Reply"), [Filing No. 74]; and Defendants filed a Reply in Support of Cross-Motion for Summary Judgment ("Reply"), [Filing No. 77].

In addition, Mr. Shattuck filed a Motion for Leave to File Short Surreply Brief in Opposition to Defendants' Cross-Motion for Summary Judgment, seeking permission to file a surreply brief addressing an argument raised for the first time in Defendants' Reply.  [Filing No. 78.]  Defendants did not respond or object to the motion.  Given Defendants' lack of objection and the fact that Defendants raised a new argument for the first time in their Reply, Mr. Shattuck's Motion for Leave, [78], is **GRANTED** to the extent that the Court will consider the proposed surreply brief ("Surreply"), [Filing No. 78-1], in resolving the summary judgment motions.  *See Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utilities*, 410 F. Supp. 3d 943, 949 (S.D. Ind.

---

[5] Although Mr. Shattuck asserted a claim for intentional infliction of emotional distress ("IIED") in his Amended Complaint, [Filing No. 32 at 6], that claim is not addressed in his Motion for Partial Summary Judgment or related briefing, [*see* Filing No. 65; Filing No. 67].  In addition, no IIED claim is included in Mr. Shattuck's Statement of Claims.  [Filing No. 64 at 1.]  Accordingly, the Court concludes that any IIED claim is abandoned.  This determination does not affect Mr. Shattuck's ability to seek damages for emotional harm resulting from his other claims, which he expressly references in his Motion.  [Filing No. 65 at 1.]

2019) ("Courts allow a surreply brief only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response.").

### III.
#### DISCUSSION

#### A. Mr. Shattuck's Initial Motion for Summary Judgment

##### 1.  Federal Constitutional Claims

Mr. Shattuck asserts two federal constitutional claims against the Individual Defendants based on their entry into and remaining within his home.  The Individual Defendants argue that: (1) they did not violate Mr. Shattuck's constitutional rights; and (2) regardless, they are entitled to qualified immunity.  The Court will first discuss whether the Individual Defendants' actions violated the Fourth Amendment and then turn to the issue of whether qualified immunity shields them from liability.  The Court takes great care to view the facts in the light most favorable to the Individual Defendants.

##### a.  Entry into the Shattucks' Home

In his Initial Motion, Mr. Shattuck argues that it is undisputed that the Individual Defendants did not have consent or a warrant to enter his home and, viewing the facts in the light most favorable to Defendants, the forced entry was not justified by exigent circumstances and therefore violated the Fourth Amendment.  [Filing No. 67 at 23-28.]  He asserts that at the time of entry, the Individual Defendants were aware of six relevant facts: (1) a five-year-old girl resided in the home with her parents; (2) the voice of a female child, exhibiting no apparent distress, had been heard inside the home; (3) Mr. Shattuck's vehicle was parked in the driveway; (4) the initial complaint from the Report Source indicated that Mr. Shattuck was often home alone with S.S.; (5) Alicia had returned home and remained outside of the home without expressing any concern

24

that S.S. might be inside alone; and (6) no adult answered the door after multiple knocks.  [Filing No. 67 at 24.]  Mr. Shattuck argues that most of these facts suggested that he was home, and the only fact purportedly giving rise to exigent circumstances was his failure to respond to repeated knocking on the door.  [Filing No. 67 at 24.]  However, he asserts, it is well-settled that a person has no obligation to open the door or speak with law enforcement, and therefore Defendants must point to an affirmative sign of exigency, beyond failure to answer the door.  [Filing No. 67 at 24-25.] Mr. Shattuck argues that hearing movement or a child's voice inside the house was insufficient to establish exigent circumstances, and the possibility that a child is alone, without more, does not create exigent circumstances justifying warrantless entry.  [Filing No. 67 at 25-28 (citing, *inter alia*, *United States v. Venters*, 539 F.3d 801 (7th Cir. 2008)).]  Mr. Shattuck contends that the circumstances of this case are even further removed from the situations in which other courts have held warrantless entries based on the presence of an unsupervised child unconstitutional, because by the time the Individual Defendants forced entry into the Shattucks' home, "they were no longer even acting on the *possibility* that a child was unattended; they *knew* that the child's mother (one of the two adults who lived with S.S.) was immediately outside of the house."  [Filing No. 67 at 27-28 (emphasis in original).]  Mr. Shattuck also points out that any contention that the Individual Defendants were justified by exigent circumstances is undercut by the fact that the DCS Defendants arrived at the home at approximately 3:15 p.m. and reported hearing a child's voice shortly thereafter, but entry was not forced until approximately 4:19 p.m.  [Filing No. 67 at 28 n.10.]  Had the Individual Defendants truly perceived that a child was in distress, Mr. Shattuck argues, "this delay is inexplicable."  [Filing No. 67 at 28 n.10.]

    In their Cross-Motion/Response, Defendants argue that entry into the Shattucks' home was justified by probable cause and exigent circumstances.  [Filing No. 72 at 8-12.]  Specifically, the

Individual Defendants assert that they had a reasonable belief that S.S. was home alone and potentially in danger given that: (1) they were investigating a report of potential sexual abuse; (2) there was a history of similar allegations against Mr. Shattuck; (3) Ms. Pherson, Ms. Hill, and Deputy Decker heard a child's voice inside the home but did not hear any other voices; and (4) no adult answered the door.  [Filing No. 72 at 9-10.]  Defendants also contend that "Alicia's arrival did nothing to lessen the Defendants' concern" because "[n]othing Alicia did or said lead (sic) the Defendants to believe S.S's (sic) was safe or she was inside with an adult." [Filing No. 72 at 10.] Defendants argue that these circumstances gave rise to a reasonable belief that S.S. might be in danger, and "[a]lthough the Defendants did not possess ironclad proof S.S. was home alone, there was sufficient uncertainty regarding her wellbeing requiring forced entry into the home." [Filing No. 72 at 11-12.]  Defendants contend that "[t]he expectation that police officers be required to obtain a warrant before entering a home could result in serious injury or death when S.S. may [be] by herself and possibly neglected or abused." [Filing No. 72 at 12.]

In his Response/Reply, Mr. Shattuck reiterates that the Individual Defendants' forced entry into the residence was not justified by exigent circumstances and therefore violated the Fourth Amendment.  [Filing No. 74 at 10-14.]  Specifically, he asserts that the facts known to the Individual Defendants at the time were entirely consistent with, and indicative of, Mr. Shattuck's presence inside the home and individuals have a recognized constitutional right not to answer the door or speak with police officers. [Filing No. 74 at 10-11.] He maintains that Defendants have offered no affirmative evidence of exigency and that some of the Individual Defendants allegedly hearing a child's voice inside the home is insufficient because they knew a child lived at the residence, they noted that the voice did not exhibit signs of distress, and under *Venters* and other cases the mere possibility that a child is unsupervised does not amount to exigent circumstances.

[Filing No. 74 at 11-13.]  Mr. Shattuck argues that "the best the defendants are able to say is that they were 'uncertain' about whether S.S. had been left alone," but the Fourth Amendment requires more than uncertainty; it requires affirmative proof of exigency.  [Filing No. 74 at 13.]  Mr. Shattuck also points out that before entry was made, Alicia had arrived and was not expressing any concern that S.S. might be home alone, and Defendants' exigency argument, if accepted, "would appear to allow for law enforcement officers to enter a private residence even when they know beyond the shadow of a doubt that a child's parents are in close proximity." [Filing No. 74 at 10-11.]  In sum, Mr. Shattuck maintains that "the only evidence of an emergency offered by the defendants is the fact that their knocks went unanswered . . . [and] if this is sufficient to create exigent circumstances, then no parent or caretaker in the country retains the right, recognized by the Supreme Court, to refuse 'to open the door or to speak' with police officers." [Filing No. 74 at 14 (quoting *Kentucky v. King*, 563 U.S. 452, 469-70 (2011)).][6]

In their Reply, Defendants maintain that exigent circumstances existed based on the following undisputed facts: (1) there was a report stating that Mr. Shattuck was previously a registered sex offender, that he was home with S.S. 60 to 80 percent of the time, and that the two had secrets; (2) multiple attempts to make contact with someone inside the residence during the visit went unanswered; and (3) the Individual Defendants contacted Mr. Roberts, who advised that there were exigent circumstances justifying entry into the residence.  [Filing No. 77 at 2-3.]

---

[6] Mr. Shattuck also asserts that "while not disputed, several of the facts articulated in the defendants' brief do not fairly reflect the record or require further explication." [Filing No. 74 at 8-9.]  Specifically, Mr. Shattuck takes issue with Defendants' characterization of the video evidence and statement that it is undisputed that Defendants believed they had a "verbal access order" from Mr. Roberts, because "verbal access order" is a legally meaningless term. [Filing No. 74 at 8-9.]  The Court assures the parties that it has reviewed all the evidence, it does not rely exclusively on the parties' characterizations or summaries of the evidence, and the videos speak for themselves.

In relevant part, the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.  In the Fourth Amendment context, the Supreme Court has explained:

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. . . . And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.

*Kentucky v. King*, 563 U.S. 452, 469-70 (2011).[7]

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980).  "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted).  For example, a warrant is not required where "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978)); *see also Payton*, 445 U.S. at 590 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.").

---

[7] Although much of the caselaw cited herein refers explicitly to police officers, it is undisputed that the Fourth Amendment applies with equal force to the actions of the DCS Defendants. *E.g.*, *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) ("[T]he strictures of the Fourth Amendment apply to child welfare workers, as well as all other governmental employees.").

"Whether the exigent circumstances exception justifies warrantless action is judged by an objective standard: [courts] ask whether it was reasonable for the police officers on the scene to believe, in light of the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014). "There must be a genuine need to forego the warrant process; and in assessing that need, [courts] must focus not only on the moment that police made the decision to make the warrantless entry, but rather 'appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door.'" *Id.* (quoting *United States v. Patino*, 830 F.2d 1413, 1416 (7th Cir. 1987)). The government bears the burden of demonstrating that there was some affirmative, objective evidence showing the existence of exigent circumstances. *See United States v. Delgado*, 701 F.3d 1161, 1165 (7th Cir. 2012) (recognizing that it is "incumbent upon the government to point to some affirmative sign of exigency"); *United States v. Etchin*, 614 F.3d 726, 733-34 (7th Cir. 2010) ("Our cases reflect the rule that an emergency justifying entry and a search arises only if the officer knocking at the door observes objective evidence that there is an ongoing crime within that must be stopped before it is completed.").

One specific subset of the exigent circumstances exception is the emergency aid doctrine, which "recognizes that police play a service and protective role in addition to a law enforcement role" and therefore "may sometimes need to enter a dwelling in order to render aid to an occupant whom they believe to be in distress and in immediate need of their assistance." *Sutterfield*, 751 F.3d at 558 (7th Cir. 2014); *see also Brigham City*, 547 U.S. at 403 ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). "The test for [the emergency aid] exception is also

objective: the question is whether the police, given the facts confronting them, reasonably believed that it was necessary to enter a home in order to render assistance or prevent harm to persons or property within." *Sutterfield*, 751 F.3d at 558 (internal quotations and citation omitted). Concrete facts supporting a reasonable belief that someone is injured are required. *See United States v. Arch*, 7 F.3d 1300, 1304 n.3 (7th Cir. 1993) (recognizing that the emergency aid doctrine "does not permit the police to enter someone's home or hotel room without a warrant based solely on an inchoate hunch that an injured person might be present; there must instead be concrete facts rendering it reasonable to believe that someone inside needs medical attention" (citations omitted)).

In *Venters*, the Illinois Department of Children and Family Services ("DCFS") received a report that Eric Venters and his wife, Natalie, had been neglecting their three children. 539 F.3d at 804. Specifically, Natalie's stepmother reported that: (1) the Venters' house "was 'filthy, stinks, and [was] full of human and animal feces'"; (2) the Venters "made, sold, and used meth"; and (3) one of the children had stated that "he goes with his daddy sometimes where his daddy cooks in the barn." *Id.* (alteration in original). When a DCFS worker followed up with Natalie's stepmother, she further reported that Mr. Venters had a history of using and manufacturing meth and had previously been arrested for meth-related crimes. *Id.* The stepmother described the home as "terrible," "nasty," and having "an odor" resulting from Mr. Venters' use and manufacturing of meth inside the house, and she advised DCFS that when the children visit her, "she makes it a habit to bathe them and to give them clean clothes because 'she can smell the meth' on the clothes that they are wearing." *Id.* The DCFS worker and a police officer visited Natalie—who was in the hospital at the time, leaving the children in the care of Mr. Venters—and Natalie confirmed that

Mr. Venters was addicted to meth, his health had deteriorated as a result, and he was "probably" making the drug. *Id.*

The DCFS worker and two police officers travelled to the Venters' home to investigate the allegations of child neglect. *Id.* at 805. When they arrived, an officer knocked on the door but received no response. *Id.* The officer looked through a window and "observed that there were feces on the floor and that the room was extremely cluttered." *Id.* A second officer knocked on the door and, after receiving no answer, looked through a different window, and "saw 'a child on the couch' who 'raised his head,' but did not otherwise move." *Id.* Accordingly, the second officer opened the unlocked door and announced that he was there "to check on the welfare of the children." *Id.* Although the officer was yelling "at the top of his voice," the child, who had no clothes on and was covered only by a small blanket, did not move. *Id.* Other officers and the DCFS worker then entered the home, discovered the remaining two children—both of whom were "extremely dirty" and "lying naked on a 'very dirty mattress' with no sheets." *Id.* An ambulance was called to assist the children, and an officer located Mr. Venters in a tool shed behind the house and arrested him for child neglect. *Id.* at 805-06. Shortly thereafter, officers obtained two search warrants that allowed them to reenter the house, photograph the conditions inside, and search for drugs or related paraphernalia. *Id.* at 806. Mr. Venters was charged with possessing items used to manufacture meth and sought to suppress evidence discovered in the house and shed, arguing that the initial warrantless entry into his home was not justified by exigent circumstances. *Id.*

On appeal, the Seventh Circuit affirmed the district court's denial of Mr. Venters' motion to suppress, concluding that officers had probable cause to believe that Mr. Venters was committing child neglect and that exigent circumstances justified their entry into the residence. *Id.* at 807-08. As to exigent circumstances, the court pointed to the officers' knowledge that "for

the previous three-to-four days, the Venters children were living in a dangerous environment that posed serious threats to their well-being: a decrepit, unsanitary house with little or no adult supervision, and where their father regularly used, and probably made, meth in their presence."

*Id.* at 808.   The court also observed that it is well-known that the chemicals and fumes involved in the use and manufacture of meth can be harmful to third parties, especially children, and that when officers observed a child nearly unresponsive on the couch, "it was eminently reasonable for the officers to have feared that [the child's] groggy movements meant that he was sick from meth fumes, was hurt from an accident that occurred while his father was making meth, had ingested the drug, or worse—all scenarios that would have required emergency medical attention." *Id.* "Simply put, there was nothing unreasonable about [the officers'] belief that they needed to enter Venters's house to provide [the child] emergency medical care, and once inside, they were right to ensure the safety of his siblings as well." *Id.* (internal citation omitted).   However, the Court was careful to limit the scope of its holding, stating:

> [W]e wish to emphasize the narrowness of our determination that exigent circumstances justified [the officers'] entry into Venters's house. *The situation at the house was not one where [the officers'] knocks simply went unanswered; nor was it a situation where the officers saw that the children were healthy and unharmed inside, but yet unsupervised.* Instead, it was a situation where [the officers] (1) were aware that, for the three-to-four previous days, a drug-addicted father was left alone to "care" for his three young children, and that their house was in a state of extreme filth; (2) knew of credible and corroborated allegations that the father had exposed the children to meth in the past, including the manufacture of the drug, to such an extent that their clothing reeked of the drug; (3) observed that a small child inside the house did not immediately react to their prolonged pounding on the door; and (4) believed that the child's extremely delayed and lethargic reaction to the pounding suggested a medical problem caused by the dangerous environment in which he lived. And given these unique facts, the officers' belief that they needed to respond to a medical emergency inside was reasonable, and their entry into the house was prudent.

*Id.* at 808-09 (emphasis added).

Other courts have reached similar results.  In *United States v. Gillespie*, 332 F. Supp. 2d 923, 928 (W.D. Va. 2004), the court concluded that exigent circumstances did not exist where officers heard a child crying inside an apartment and two occupants who jumped off the apartment's balcony appeared to leave the children unattended.  Acknowledging that "the officers may have believed that there were children in the apartment and been genuinely concerned about them," the court determined that a reasonable officer "could investigate the matter further, perhaps by contacting the mother, but would probably not conclude that a warrantless entry was necessary" or believe that "this situation rose to the level of an emergency which required immediate entry." *Id*.  *See also Ford v. D.C.*, 2016 WL 4379038, at *4 (D.D.C. Aug. 16, 2016) (citing *Gillespie* and concluding that where police officers "knocked and announced their presence, they heard a baby crying, they knew [the homeowner] to be an attentive mother, and they felt something was wrong," exigent circumstances did not exist to justify a warrantless entry into the home).

As an initial matter, Defendants suggest in their briefing that the Individual Defendants had probable cause to believe that Mr. Shattuck was sexually abusing his daughter.  [Filing No. 72 at 9-10.]  In traditional exigent circumstances cases, courts have analyzed whether officers have probable cause to believe a crime is being committed, in addition to whether there are exigent circumstances justifying their entry.  *See Leaf v. Shelnutt*, 400 F.3d 1070, 1082 n.10 (7th Cir. 2005) (observing that some cases in this Circuit "do not address the requirement of probable cause separately from the existence of exigent circumstances," while "other cases of this court do apply the requirement of probable cause even in exigent circumstances").  This was the case in *Venters*. *See* 539 F.3d at 806-07 (stating that "the Fourth Amendment does permit an officer to enter a house without a warrant where there is (1) probable cause supporting the entry; and (2) exigent circumstances," and analyzing whether the defendants "had probable cause to believe that [Mr.]

Venters had violated Illinois law by allowing his children to live in a house that his neglect and depravity rendered unfit" before reaching the question of exigent circumstances).  The Seventh Circuit in *Sutterfield*, however, explained that it often makes little sense to speak of probable cause in the emergency aid context, where police action is justified not by a suspicion of criminal activity, but by a need to act to protect a person from imminent injury.  751 F.3d at 563-64.  "It may be, then, that probable cause in the emergency aid context is not reason to believe a crime is occurring or has been committed, but reason to believe that someone is in need of aid and there is a compelling need to act."  *Id.* at 564 (citations omitted).  Here, given that Defendants rely on the emergency aid doctrine in support of their exigent circumstances arguments, any inquiry into probable cause essentially collapses into the inquiry regarding whether the Individual Defendants reasonably believed that it was necessary to enter the home to provide aid to S.S., and the Court need not separately consider whether probable cause existed to believe a crime had been or was being committed.[8]

---

[8] To the extent that it is necessary to consider whether the Individual Defendants had probable cause to believe that Mr. Shattuck was sexually abusing his daughter, the Court concludes that they did not.  "Probable cause exists if police officers possess knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that [the] suspect has committed, or is committing, a crime."  *Venters*, 539 F.3d at 807 (alteration in original) (internal quotations and citation omitted).  In *Venters*, the Court concluded that probable cause existed because: (1) nothing indicated that Natalie's stepmother was untrustworthy; (2) she gave two separate, detailed reports that Mr. Venters allowed his three children to live in a filthy and feces-ridden house where he used and manufactured meth; and (3) her allegations were corroborated by Natalie and by law enforcement's observations that the living room was extremely cluttered and that there were feces on the floor.  *Id.*  Here, on the other hand, the Report Source's allegations were based on "gut uncomfortable feelings" and were not corroborated by any other person.  They were initially "screened out."  The Vigo County Defendants were not involved in the criminal investigation, and instead were responding to a perceived emergency.  And when the Individual Defendants were outside of the Shattucks' home, they did not observe anything indicative of sexual abuse.  Mr. Roberts perhaps said it best in his deposition: "[I]t was not a criminal investigation.  There was nothing during our conversation that indicated [the Individual Defendants] had any belief that a crime had taken place where there would be evidence of that

The Court's task is to determine, based on the totality of the circumstances, viewed in the light most favorable to Defendants, whether it was reasonable for the Individual Defendants to force entry into the Shattucks' home based on the need to render emergency aid. Defendants focus primarily on four facts, which they believe justify their entry: (1) the Individual Defendants were investigating potential sexual abuse; (2) some of the Individual Defendants heard what they believed to be a child's voice coming from inside the home; (3) no adult answered the door; and (4) the Individual Defendants consulted with a prosecutor, who concluded that exigent circumstances existed. When viewed in combination with all the other facts known to the Individual Defendants, however, none of these facts were sufficient to create a reasonable belief that it was necessary to force entry into the Shattucks' home.

The allegations levied by the Report Source against Mr. Shattuck were serious.[9] Nevertheless, the allegations contained information that Mr. Shattuck worked from home and was home with S.S. 60 to 80 percent of the time. After arriving at the house, Ms. Pherson, Ms. Hill, and Deputy Decker heard a child's voice coming from inside the home, but the voice did not exhibit any signs of distress. No adult answered the door, but Mr. Shattuck's car was parked in the driveway. At this point, the Individual Defendants may have believed that S.S. was in the house alone, but Defendants have not pointed to any affirmative indication that S.S. was injured, was in imminent danger of being injured, or was presently in need of medical care.

In their briefing, Defendants repeatedly emphasize the nature of the allegations against Mr. Shattuck and assert that there was a reasonable basis to believe that S.S. was abused or neglected.

---

crime inside of the house. It was a completely separate issue for why they were there other than a specific criminal investigation . . . ." [Filing No. 65-11 at 5.]

[9] Exactly how concerning these allegations were is unclear, given that DCS initially screened them out, apparently concluding that they were not worthy of investigation.

[*See, e.g.*, Filing No. 72 at 11 (noting that DCS's "assessment involved allegations of neglect and sexual abuse" and "[Mr.] Shattuck's history was also a factor"); Filing No. 72 at 12 (arguing that the Individual Defendants forced entry to "assist[] a child they believed could [be] injured, abused or neglected").]  Significantly, though, nothing in the Report Source's allegations suggested that S.S. was being neglected, was known to be left home alone, or might need medical assistance relating to a continued lack of care.  Similarly, nothing in the allegations suggested that she was being physically injured or was at risk of imminent physical injury.[10]  The allegations against Mr. Shattuck might impact the exigent circumstances analysis if the Individual Defendants had reason to believe Mr. Shattuck was abusing S.S. as they stood outside the door, but there was no evidence causing them to believe that, and in fact they claimed to believe the opposite: that Mr. Shattuck was not home at all.

Moreover, the Seventh Circuit took great care in *Venters* to distinguish situations like this one—where a child may potentially be unsupervised, yet also unharmed—from those in which entry is justified by exigent circumstances or the need to render emergency aid.  In *Venters*, officials were acting on specific, first-hand accounts from Natalie and her stepmother that Mr. Venters made and used meth, exposed his children to the drug, and kept the house in a state of uncleanliness that made it unsafe for children.  539 F.3d at 804.  When officials arrived at the home, these reports were largely confirmed—the officials observed extreme clutter, feces on the floor, and an unsupervised and nearly unconscious child, whose state could potentially be attributed to exposure to methamphetamine.  *Id.* at 805.  By contrast, officials in this case were

---

[10] The Court in no way intends to minimize the harm suffered by victims of sexual abuse. However, the exigent circumstances doctrine requires some threat of imminent physical injury or present need for medical attention that is not demonstrated by the facts of this particular case. No facts were presented by Defendants that S.S. was being harmed in the time between their arrival and the entry.

investigating allegations made by the Report Source, who had not had any recent contact with the Shattucks and based many of his "gut uncomfortable feelings" on an incident he observed more than six months earlier.  Furthermore, when the Individual Defendants arrived at the home, they saw no affirmative indication that S.S. was in danger of imminent physical harm and nothing that would corroborate the Report Source's allegations.  If anything, the Individual Defendants' belief that S.S. was home alone is inconsistent with the Report Source's allegations, which stated that Mr. Shattuck and S.S. were home together most of the time.

Further distinguishing this case from *Venters* and other emergency aid scenarios is the fact that Alicia arrived at the home prior to the forced entry.  In *Venters*, Natalie—who was confined to the hospital—provided information to DCFS and law enforcement confirming that her children could be in danger as a result of Mr. Venters' use and manufacture of meth and his associated deteriorating health.  539 F.3d at 804.  Here, however, Alicia arrived on scene and did not provide any information either corroborating the Report Source's allegations against Mr. Shattuck or suggesting that S.S. was home alone or otherwise in danger.  Defendants repeatedly emphasize in their briefing that Alicia would not cooperate with the Individual Defendants and did not respond to questioning about S.S.  [*See, e.g.*, Filing No. 72 at 10 ("Nothing Alicia did or said lead (sic) the Defendants to believe S.S's (sic) was safe or she was inside with an adult.").]  But Alicia had no obligation to answer questions or cooperate with law enforcement.  *See, e.g.*, *King*, 563 U.S. at 469-70.  The inference that Defendants draw from Alicia's noncooperation—that "Alicia's lack of cooperation and refusal to communicate could only reasonably heighten Defendants' concerns for S.S's safety," [Filing No. 72 at 11]—is not a reasonable one, and Defendants merely make this assertion without providing a meaningful explanation suggesting why the mother of a child believed to be in danger would tell officials not to enter the home to help if she shared that belief.

Defendants acknowledge that Alicia explicitly told the Individual Defendants that they could not enter the home without a warrant, [Filing No. 72 at 5 (Defendants' Statement of Material Facts Not In Dispute listing, "Alicia then yelled to Defendants that they could not go into the house without a warrant.")], and were aware that she was on the phone with Mr. Shattuck, [Filing No. 65-6 at 15]. This information cannot be easily reconciled with the Individual Defendants' purported belief that S.S. was in some kind of danger and does not provide a basis upon which a reasonable officer in the situation could conclude that S.S. was home alone.

In addition, the mere fact that Mr. Shattuck did not answer the door is insufficient to create a reasonable belief that exigent circumstances existed in this case, given his known hostility toward and distrust of law enforcement. *See Delgado*, 701 F.3d at 1165 ("Silence in this context cannot be [an affirmative sign of exigency], as it could have easily meant any number of things having nothing to do with exigent circumstances."). In other words, Defendants' emphasis on Mr. Shattuck's history with law enforcement and DCS weakens rather than strengthens their case, because it highlights another reasonable explanation for his failure to answer the door. The Seventh Circuit has explained that where multiple "equally plausible possibilities" exist, officers have a duty to inquire further, and "it is not reasonable for the police to proceed on the theory that 'ignorance is bliss.'" *United States v. Terry*, 915 F.3d 1141, 1145 (7th Cir. 2019) (quoting 4 Wayne R. Lafave, Search and Seizure § 8.3(g) (5th ed. 2018)). The Individual Defendants did continue to investigate by contacting Alicia, but the result of that investigation was an express directive from Alicia not to enter the home. Entering anyway—still without any new information to suggest that Mr. Shattuck was not answering the door because he was not home, rather than because he wanted to avoid an encounter with law enforcement and DCS—was not reasonable.

One final point worthy of mention is the timeline of events. DCS received the initial report on July 11, 2019, the case was assigned to Ms. Pherson on July 15, and she visited the Shattucks' home on July 17. This timeline does not indicate that anyone at DCS perceived there to be a threat of imminent injury to S.S. based on the allegations made by the Report Source. In addition, Ms. Pherson and Ms. Hill arrived at the Shattucks' home at approximately 3:15 p.m. and allegedly heard a child's voice shortly thereafter, and Deputy Decker arrived at approximately 3:34 p.m. and allegedly heard a child's voice shortly thereafter, but entry was not forced until approximately 4:20 p.m. This delay belies the assertion that the Individual Defendants believed that S.S. was in imminent danger or immediate need of assistance.

For all of these reasons, the forced entry into the Shattucks' home was not reasonable, not justified by exigent circumstances or the need to render emergency aid, and therefore violated the Fourth Amendment as a matter of law. But the discussion does not end there. Once Deputy Decker kicked open the door, it became immediately apparent that Mr. Shattuck was home, and therefore any belief that exigent circumstances existed immediately dissipated. Nevertheless, all of the Individual Defendants proceeded to enter the home. Accordingly, there must have been some other reason—independent of the belief that S.S. was home alone—justifying their entry into the home.

In their briefing, the parties appear to treat the Individual Defendants' "entry" as one single event encompassing the breaking down of the door and the subsequent crossing of the threshold after it was clear that Mr. Shattuck was inside. [*See* Filing No. 67 at 22-28; Filing No. 72 at 9-12.] But given the immediate and significant change in circumstances that occurred when Deputy Decker broke open the door and the Individual Defendants saw Mr. Shattuck standing in the living room, the two events must be analyzed separately.

In their depositions, the Individual Defendants state that they went inside the home because they could not physically see S.S. and believed it was their responsibility to ensure her safety. [Filing No. 65-6 at 16 (Ms. Pherson); Filing No. 65-8 at 11 (Deputy Decker).] But again, the only reason the Individual Defendants purportedly feared for S.S.'s safety is because they believed she was home alone—they point to no other fact or circumstance suggesting that she was at risk of injury or harm. As discussed above, the allegations made by the Report Source alone were not sufficient to create exigent circumstances. When their belief that S.S. was home alone proved to be incorrect, the Individual Defendants were left with no reason to enter the house.

In sum, viewing the facts in a light most favorable to Defendants, the Court concludes as a matter of law that no reasonable officer could have believed that the breaking down of the door and the subsequent crossing of the threshold were reasonable under the circumstances. Accordingly, each of the Individual Defendants violated the Fourth Amendment.

### b. Remaining Inside the Home

In his Initial Motion, Mr. Shattuck argues that the Individual Defendants' decision to remain in his home after learning that he was present was not justified by either exigent circumstances or consent, and therefore violated the Fourth Amendment. [Filing No. 67 at 29-33.] First, he asserts that even if the initial entry was justified by exigent circumstances, any exigency dissipated once the Individual Defendants learned that Mr. Shattuck was inside the house. [Filing No. 67 at 29.] Second, Mr. Shattuck argues that the Individual Defendants' decision to remain was not justified by consent because: (1) his actions did not demonstrate consent; and (2) even if his actions could somehow be interpreted as evidencing consent, such consent was not voluntary. [Filing No. 67 at 30-31.] Specifically, Mr. Shattuck contends that his "actions exhibited the very antithesis of consent," because he "objected vehemently to [the Individual Defendants'] presence,

demanded to see a search warrant, repeatedly accused the defendants of 'harassment' and of 'mad-dogging [him],' and expressly indicated that the defendants were in 'trouble.'" [Filing No. 67 at 30 (final alteration in original).]  He argues that the fact that he did not physically prevent the DCS Defendants from interviewing S.S. does not equate to consent and, regardless, "even this interview took place several minutes after the protective sweep of the house, such that there is undeniably a period of time where even the defendants appear to acknowledge that their presence was justified neither by exigent circumstances nor by consent." [Filing No. 67 at 30-31.]  Mr. Shattuck further argues that, to the extent his actions demonstrated consent, consent is not voluntary when it is offered only in response to a claim of lawful authority, such as the Individual Defendants' repeated assertions that they had a warrant or some kind of order from the prosecutor authorizing them to enter the home. [Filing No. 67 at 31 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)).]  Finally, Mr. Shattuck argues that any consent obtained was tainted by the original illegal entry, given the sudden and forceful nature of the entry, the short period of time between the entry and the purported consent, and the absence of any intervening circumstances that would have attenuated the impact of the illegal entry. [Filing No. 67 at 32-33 (citing *United States v. Robeles-Ortega*, 348 F.3d 679, 681 (7th Cir. 2003)).]

In their Cross-Motion/Response, Defendants argue that the Individual Defendants were justified in remaining in the Shattucks' home based on implied consent and exigent circumstances. [Filing No. 72 at 13-16.]  First, Defendants argue that Mr. Shattuck consented to the DCS Defendants remaining in the house to interview S.S., and in doing so he impliedly consented to the Vigo County Defendants remaining in the house until the interview was completed. [Filing No. 72 at 13-14.]  Defendants assert that, "despite [Mr.] Shattuck's open hostility toward" the Individual Defendants, neither he nor Alicia ever asked any of the Defendants to leave after

consenting to the interview and he maintained "a near constant dialogue with at least one of the Defendants during the time they were inside the residence." [Filing No. 72 at 14.] Defendants argue that the Individual Defendants' actions while inside the residence were "reasonable and non-threatening" and they remained in the living room for the duration of the encounter, with the Shattucks' implied consent. [Filing No. 72 at 14.] Defendants further contend that exigent circumstances justified the continued presence inside the Shattucks' home, because "S.S's health and safety could not be ascertained until the interview was completed." [Filing No. 72 at 15.] Defendants assert that the safety of the DCS Defendants could not be assured given Mr. Shattuck's hostility toward them, which justified the continued presence of the Vigo County Defendants. [Filing No. 72 at 15.] Defendants state: "Remaining in the home during the interview was preferable to taking Mr. Shattuck or S.S. outside further escalating an already emotional situation. Leaving Ms. Pherson and Ms. Hill inside with Mr. Shattuck without the Vigo County Defendants['] presence was not an option." [Filing No. 72 at 15.]

In his Response/Reply, Mr. Shattuck maintains that the Individual Defendants' decision to remain in his home after forcing entry was not justified by either exigent circumstances or consent. [Filing No. 74 at 14-19.] Specifically, he argues that Defendants acknowledge that they cannot rely on the same allegedly exigent circumstances that they believe justified the initial entry because they learned immediately after entry that Mr. Shattuck was indeed home, and that the other two purported exigencies—that the Vigo County Defendants needed to remain to protect the safety of the DCS Defendants, and that all Defendants needed to remain to protect the safety of S.S.—are without merit. [Filing No. 74 at 14-15.] Mr. Shattuck contends that the argument that the Vigo County Defendants needed to protect the DCS Defendants is "clearly off-base" because the DCS Defendants were not entitled to be inside the house in the first place. [Filing No. 74 at 15.] He

further argues that Defendants have not identified any specific facts that gave rise to a reasonable belief that S.S. or anyone inside the home faced an imminent threat of injury, which would be necessary to justify their presence in the home under the emergency aid prong of the exigent circumstances doctrine. [Filing No. 74 at 15-17.] Instead, Mr. Shattuck argues, the Individual Defendants were acting based only on vague allegations made by a person who had no recent contact with the family, and those allegations were initially "screened out" by DCS and not ultimately investigated until five days after the report was made, demonstrating that the DCS Defendants did not perceive any threat of immediate harm. [Filing No. 74 at 16-17.] Mr. Shattuck asserts that no evidence in the record suggested that S.S. had been recently harmed or was in immediate danger of being harmed, and when the Individual Defendants entered the Shattucks' home, S.S. was understandably frightened by the encounter but was fully clothed and did not appear to be in any physical distress. [Filing No. 74 at 16-17.] According to Mr. Shattuck, "applying the exigent-circumstances doctrine to these circumstances would render utterly meaningless the Fourth Amendment's warrant requirement whenever an individual is accused of a violent crime." [Filing No. 74 at 17.] Mr. Shattuck also reiterates his argument that under *Bumper*, regardless of whether his behavior might have otherwise manifested consent, such consent is not valid if offered only in response to a claim of lawful authority, such as the Individual Defendants' repeated representations that they had a warrant or verbal order granting them permission to be inside his home. [Filing No. 74 at 17-18.] He also reiterates that any consent was tainted by the illegal entry and points out that Defendants did not meaningfully address either of these arguments in their Cross-Motion/Response. [Filing No. 74 at 17-18.] Mr. Shattuck contends that Defendants' argument that the Shattucks "allowed" the DCS Defendants to interview S.S. should be viewed with skepticism, given that several of the Individual Defendants testified that there was nothing

Mr. Shattuck could have done to convince them to leave his home.  [Filing No. 74 at 18-19.] Moreover, he asserts, Defendants did not explain how Mr. Shattuck "allowed" them to remain in his home, given that the totality of circumstances demonstrates that he did not manifest his consent. [Filing No. 74 at 19.]

As to the issue of consent, Defendants argue in their Reply that Mr. Shattuck "disregards a critical fact: Mr. Shattuck was not the only resident present for purposes of consent." [Filing No. 77 at 5.]  They assert that Alicia was present at the time of entry and was "in equal standing" to Mr. Shattuck to consent to the Individual Defendants' presence in the home.  [Filing No. 77 at 5.] Furthermore, Defendants contend, the video shows that Alicia asked the DCS Defendants whether they wanted to speak with S.S. alone, and was "clearly attempting to deescalate and facilitate *how* and *where* an interview of S.S. would be conducted in the residence rather than *if* an interview of S.S. would be conducted at all." [Filing No. 77 at 6 (emphasis in original).]  Defendants maintain "that Mr. Shattuck never expressly refused consent" and his interactions with the Individual Defendants "focused upon *why* defendants [were] present rather than whether they may remain." [Filing No. 77 at 5-6.]  Accordingly, Defendants argue, "barring an express refusal of consent, Mr. Shattuck's protestations did not nullify the legal effect of [Alicia's] actions," which demonstrated implied consent for the Individual Defendants to remain inside the home.  [Filing No. 77 at 6.]

In his Surreply, Mr. Shattuck argues that Defendants appear to accept his argument that he did not consent to their presence in his home, so they assert for the first time that Alicia consented. [Filing No. 78-1 at 1.]  He contends that because this argument was raised for the first time in the reply brief, it should be deemed waived.  [Filing No. 78-1 at 1.]  Regardless, Mr. Shattuck asserts that Defendants' argument that Alicia consented fails for several reasons.  [Filing No. 78-1 at 2-3.] First, he argues, Alicia's question regarding whether the DCS Defendants wanted to speak to S.S.

alone was merely the beginning of an inquiry, not an expression of consent, and Alicia had expressly told the Individual Defendants before entry that they could not enter the house or speak to S.S. without a warrant.  [Filing No. 78-1 at 2.]  Mr. Shattuck also asserts that his previous arguments regarding consent being coerced by a claim of lawful authority and tainted by the illegal entry apply with equal force to Alicia.  [Filing No. 78-1 at 2-3.]  Finally, Mr. Shattuck points out that both the DCS Defendants responded to requests for admissions wherein they admitted that Alicia did not consent to them remaining inside the home.  [Filing No. 78-1 at 3.]

i.   Exigent Circumstances

Defendants assert that their continued presence inside the home was justified by exigent circumstances relating to: (1) ensuring S.S.'s health and safety; and (2) ensuring the DCS Defendants' safety.  As discussed above, Defendants point to no affirmative or concrete evidence that S.S. was in any way injured, in imminent danger of harm, or in need of medical or law enforcement assistance.  Indeed, Defendants point only to the fact that they initially believed S.S. was home alone.  Not only is that insufficient to create exigent circumstances, but even if it were, once the Individual Defendants learned that Mr. Shattuck was inside the house, and given Alicia's presence, any potential exigency dissipated.  And again, although Defendants emphasize that they were investigating allegations of sexual abuse, nothing in those allegations was sufficient to give rise to a specific, reasonable belief that S.S. was being physically harmed or in physical distress when the Individual Defendants visited her home.  Moreover, as noted before, the DCS Defendants had waited some days before investigating, the Vigo County Defendants waited close to an hour before the forced entry, and Alicia arrived on the scene.

Defendants' second exigency argument can be rejected out of hand.  The notion that the Vigo County Defendants believed that their presence at the scene was necessary to protect the

safety of the DCS Defendants says nothing about whether the DCS Defendants' presence was justified. Absent a justification for the DCS Defendants' presence, the Vigo County Defendants' presence cannot be justified by a need to protect the DCS Defendants. In sum, no exigent circumstances justified the Individual Defendants' continued presence in the Shattucks' home.

    ii.  <u>Consent</u>

It is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent can be expressly given, or "in certain cases can be implied in the absence of clear verbal permission." *United States v. Renken*, 474 F.3d 984, 987 (7th Cir. 2007); *see also United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004) ("An 'explicit verbal consent' or any other form of affirmative invitation to enter a dwelling is not necessary to constitute 'consent' for purposes of the Fourth Amendment.") (citations omitted). For example, opening the door and stepping aside to allow an officer to enter is an expression of implied consent, especially when done in response to the officer's request to enter. *United States v. Sabo*, 724 F.3d 891, 893-94 (7th Cir. 2013). Whether an individual impliedly consented to a search is a question of fact to be determined based on the totality of the circumstances. *Id*. at 893.

"Consent can come in many forms, but it must always be given voluntarily." *Id*. (citing *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976)). The government has the burden of establishing that consent was freely and voluntarily given. *Schneckloth*, 412 U.S at 222 (citing *Bumper*, 391 U.S. at 548). In *Bumper*, the Supreme Court explained that where the government relies on consent to justify a search, it cannot meet its burden of demonstrating that consent was in fact freely and voluntarily given "by showing no more than acquiescence to a claim of lawful authority." 391 U.S. at 548-49. Specifically, the Court concluded: "When a law enforcement

officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search.  The situation is instinct with coercion—albeit colorably lawful coercion.  Where there is coercion there cannot be consent." *Id*. at 550.

In addition to determining that consent was voluntary, courts must also "determine whether the illegal entry tainted that consent." *Robles-Ortega*, 348 F.3d 681.  "The Supreme Court has identified a number of factors relevant to that inquiry, including (1) the temporal proximity of the illegal entry and the consent, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct." *Id*. (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).  "The question is whether the causal connection between the illegality and the consent was broken, and the government has the burden of persuasion on that issue." *Robles-Ortega*, 348 F.3d at 683 (citations omitted).  Even if a person voluntarily consented to a search, it may still be tainted by the illegal entry such that it is unlawful irrespective of consent.  *See id*. (explaining that the lower court's focus on whether the agents coerced consent was "misplaced" and "[t]he critical issue is whether the consent was obtained by means sufficiently distinguishable from th[e] illegal and violent entry so as to be purged of the primary taint").

In *Robles-Ortega*, law enforcement agents who were investigating potential drug crimes "forcibly entered" an apartment, without a warrant, by breaking down the door. *Id*. at 680.  Five agents entered the apartment with guns drawn and forced the occupants, including a four-year-old child, to lay on the floor in the living room while a protective sweep was conducted. *Id*.  The agents then identified the leaseholder and asked her to accompany them to another room, where they informed her that she was not a suspect and asked her to sign a consent form authorizing a search of the apartment. *Id*. at 681.  She complied, and the agents searched the apartment and seized cocaine. *Id*.  The Seventh Circuit reversed the district court's denial of the defendant's

47

motion to suppress the cocaine, concluding that the agent's illegal entry into the apartment tainted the leaseholder's consent. *Id*. at 684-85. Specifically, the Court stated:

> Because of the violent and sudden nature of the intrusion, the extremely short time period between the entry and the consent, and the absence of any other event that would have attenuated the impact of that illegal entry, we conclude as a matter of law that the evidence was not obtained by means "sufficiently distinguishable as to be purged of the primary taint." Nothing occurred in this instance that isolated the search and the discovery of the evidence from that illegal entry, or that could give us any confidence at all that "the causal connection between [the] illegal police conduct and the procurement of [the] evidence is 'so attenuated as to dissipate the taint' of the illegal action."

*Id*. (alterations in original) (citations omitted)

Defendants make much of the fact that neither Mr. Shattuck nor Alicia[11] ever explicitly asked or told the Individual Defendants to leave their home. [*See*, *e.g.*, Filing No. 72 at 22 ("While screaming and repeatedly telling the Defendants they did not have a warrant Shattuck did not order them to leave.").] That may be true, but Defendants' argument ignores the other things that Mr. Shattuck and Alicia did and said. Alicia explicitly told the Individual Defendants that they could not enter the home without a warrant. The Individual Defendants entered anyway. Mr. Shattuck then repeatedly asked to see a court order, accused DCS and law enforcement of harassing him, and stated that the Individual Defendants "illegally broke into his home." He shouted and called them names. He also repeatedly and vehemently objected to the DCS Defendants interviewing S.S. by herself. No reasonable factfinder could conclude that the totality of circumstances indicated that the Shattucks consented to the Individual Defendants being inside their home.

---

[11] Because Defendants did not raise the issue of Alicia's consent until their Reply, the argument that her consent justified the Individual Defendants' actions is waived, and the Court could reject it on that basis alone. *See*, *e.g.*, *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019) (recognizing "that arguments raised for the first time in a reply brief are waived"). Nevertheless, the Court addresses the argument on the merits recognizing that as a co-tenant, Alicia had authority to consent to the Individual Defendants' presence in the home, provided that Mr. Shattuck did not expressly refuse consent. *See Georgia v. Randolph*, 547 U.S. 103, 106 (2006).

Defendants also emphasize that the Shattucks "allowed" their daughter to be interviewed. But this characterization of the interaction is an unreasonable stretch. It is true that Alicia began to inquire whether Ms. Pherson wanted to interview S.S. alone. It is also true that Mr. Shattuck ultimately relented and permitted S.S. to be interviewed in the presence of his father with his father recording the interview. However, whether consent was given is a determination to be made based on the totality of the circumstances, and neither of these facts are sufficient to demonstrate that either of the Shattucks consented to the Individual Defendants remaining in their home for purposes of interviewing S.S. Even as his father led the DCS Defendants into another room, Mr. Shattuck continued to protest their going through his house, which further demonstrates that he objected to their presence.

Although the Court concludes that the Shattucks' actions did not manifest implied consent, even if they had, any consent would not have been valid for purposes of the Fourth Amendment because it was both: (1) obtained pursuant to a claim of lawful authority; and (2) tainted by the Individual Defendants' illegal entry. Notably, Defendants do not address these issues specifically in their briefing or provide any reason for concluding that any potential consent was voluntary or sufficiently attenuated from the entry, even though Defendants bear the burden on both of those issues. *See Schneckloth*, 412 U.S at 222; *Robles-Ortega*, 348 F.3d at 683. Nevertheless, the Court will address both.

Concerning the voluntariness of the alleged consent, Ms. Pherson and Lieutenant Anderson both represented—more than once—that they had some kind of order[12] from the prosecutor

---

[12] The Court agrees that the term "verbal access order" does not have any legal significance. Regardless, the label applied to the "order" that the Individual Defendants continuously represented that they had is immaterial—what matters is that the Individual Defendants represented that they were legally authorized to take the actions they did.

authorizing them to be inside the home, even over Mr. Shattuck's repeated assertions that they needed to present him with a written warrant. They also implied that the order authorized them to speak to S.S. Of course, neither of these facts were true. At most, what the Individual Defendants had was Mr. Roberts' opinion that they could enter the house to check on the safety of a child believed to be home alone. Nothing Mr. Roberts said indicated that the Individual Defendants had the authority to enter the home after learning that Mr. Shattuck—or Alicia—was home or to interview S.S. over her father's express objection. Regardless, both Lieutenant Anderson and Ms. Pherson continued to assert that their actions were justified by some kind of order from the prosecutor, and they repeatedly dismissed Mr. Shattuck's assertion that their conduct was illegal. In addition, several of the Individual Defendants testified that Mr. Shattuck could not have said or done anything that would have convinced them to leave the house until he allowed S.S. to be interviewed. In other words, once the Individual Defendants entered the home, Mr. Shattuck had virtually no choice but to acquiesce to their demands. Under *Bumper*, this acquiescence does not amount to voluntary consent.

Relatedly, Mr. Shattuck's ultimate acquiescence to the Individual Defendants' demands to interview S.S. was tainted by the illegal entry. Within mere minutes of breaking down the door and entering the home, Ms. Pherson began demanding to speak with S.S. and implying that some kind of order permitted her to interview S.S. Lieutenant Anderson continuously tried to convince Mr. Shattuck that he was incorrect in his assertions that he had a right to see a written order. The very short time between the entry and the alleged expression of consent weighs heavily against concluding that the two were unrelated. *See Robles-Ortega*, 348 F.3d at 683 ("The temporal proximity is relevant because a consent obtained immediately after an illegal entry is less likely to be unconnected to that entry. In this case, the court found that the consent was obtained within a

few minutes of the illegal entry. It is difficult to imagine a shorter time frame between the unconstitutional action and consent. Therefore, as a matter of law this factor weighs against a determination that the causal connection was broken."). In addition, no intervening circumstances severed the causal connection between the entry and Mr. Shattuck's acquiescence to the interview. Although the Vigo County Defendants did not draw their firearms or order anyone to lay on the floor, the sudden and illegal nature of the Individual Defendants' intrusion—which left the front door damaged and the door frame "shatter[ed] into pieces"— is otherwise similar to the intrusion at issue in *Robeles-Ortega*. Accordingly, the Court concludes that to the extent that Mr. Shattuck's or Alicia's actions could be interpreted as evidencing consent, such consent was tainted by the Individual Defendants' illegal entry, and their continued presence in the home for the duration of the interview violated the Fourth Amendment.

That is not to say, however, that the entire forty-five-minute encounter was unlawful. For the reasons discussed above, the Individual Defendants' presence in the home from the time they entered to the time the DCS Defendants finished interviewing S.S. was not justified by exigent circumstances or consent. But by the time the DCS Defendants concluded their interview with S.S. and returned to the living room, Mr. Shattuck's demeanor had changed significantly. He was talking with the Vigo County Defendants about topics unrelated to their entry and presence in his home. He then asked Ms. Pherson to explain to him why the Individual Defendants came to his house, and he led her and others into another room to have a conversation about the matter. The Court concludes that at the time when Mr. Shattuck expressed his desire to speak with Ms. Pherson about the allegations against him—which occurred approximately thirteen minutes into Mr. Shattuck's video of the encounter—Mr. Shattuck impliedly consented to the Individual Defendants' continued presence inside his home for purposes of providing him with the information he sought

about the nature of the allegations against him.  Mr. Shattuck initiated and was not coerced into that conversation.  While Ms. Pherson spoke to her supervisor, asked S.S. some follow-up questions, and wrote up a "safety plan" for the Shattucks' to sign, Mr. Shattuck continued casual conversation with the Vigo County Defendants about topics unrelated to their presence in his home, and nothing Mr. Shattuck did indicated an intention to withdraw the implied consent he gave when he initiated the conversation with the DCS Defendants about the nature of the allegations against him.  Accordingly, while the Individual Defendants violated Mr. Shattuck's Fourth Amendment rights while remaining in his home for a period of time, the scope of that violation is limited to the period between the initial entry and Mr. Shattuck's initiation of a separate conversation with the DCS Defendants in another room.

### c.   *Qualified Immunity*

Mr. Shattuck argues that the Individual Defendants are not entitled to qualified immunity with respect to the federal constitutional claims because, on the date of the incident, it was clearly established that: (1) officers may not make warrantless entry into a private home under the exigent-circumstances exception based only on the facts that a five-year-old child has been heard inside, in no apparent distress, and an adult refuses to respond to several knocks on the door; and (2) officers may not remain in that private home, without the residents' consent, for approximately forty-five minutes after they discovered that no exigency existed.  [Filing No. 67 at 33-34.]  Mr. Shattuck asserts that although an officer might be entitled to qualified immunity, even if the law is clearly established, if he can demonstrate extraordinary circumstances, reliance on the advice of counsel in this case is insufficient to meet that standard.  [Filing No. 67 at 34.]  Mr. Shattuck argues that "advice-of-counsel qualified immunity" does not apply to the decision to remain inside the Shattucks' home because Mr. Roberts did not offer any advice concerning how long the Individual

Defendants were authorized to stay inside of the residence.  [Filing No. 67 at 34.]  Mr. Shattuck further argues that advice-of-counsel qualified immunity does not support the Individual Defendants' decision to enter the home for two reasons: (1) the decision whether to enter the home did not involve complex legal issues, and instead "involved a rudimentary determination that the officials on the scene were in a better position to make than was Mr. Roberts;" and (2) Mr. Roberts was not provided with complete information because he was not advised that Mr. Shattuck's car was parked in the driveway, not informed that two adults were believed to reside in the house, not aware that the report to DCS stated concerns based on the fact that Mr. Shattuck allegedly spent too much time with his daughter, and not consulted again when Alicia arrived home. [Filing No. 67 at 34-35.]

In their Cross-Motion/Response, Defendants argue that the Individual Defendants are entitled to qualified immunity on Mr. Shattuck's federal constitutional claims.  [Filing No. 72 at 16-21.]  Even if they acted unlawfully, they assert, qualified immunity applies because their mistake was reasonable.  [Filing No. 72 at 19.]  They argue that "[r]easonably relying upon the advice of Roberts, Lt. Anderson, Dep. Decker and Pherson believed they had a verbal access order to enter the residence and that exigent circumstances then existed authorizing a warrantless entry." [Filing No. 72 at 19.]  Defendants also argue that Mr. Shattuck "has not identified any similar case that would have alerted the [Individual] Defendants they lacked probable cause to enter and remain in the home" and he "has failed to demonstrate exigent circumstances and probable cause were lacking."  [Filing No. 72 at 20 (footnote omitted).]  Finally, Defendants reiterate that the Individual Defendants had consent to remain in the home after the entry.  [Filing No. 72 at 20-21.]

In his Response/Reply, Mr. Shattuck asserts that Defendants' "qualified-immunity argument is primarily a reiteration of their erroneous arguments on the merits."  [Filing No. 74 at

20.] Mr. Shattuck maintains that under *Venters*, *King*, and other precedent, it was clearly established at the time of the incident that he had a Fourth Amendment right not to answer the door or speak with the Individual Defendants, and Defendants must point to affirmative evidence of exigency other than the mere possibility that S.S. was unsupervised to justify entry into the home. [Filing No. 74 at 20-21.] Mr. Shattuck argues that Defendants do not invoke the advice-of-counsel qualified immunity doctrine because "[r]ather than relying on the *advice* of Mr. Roberts, it appears that they are maintaining that they reasonably relied on their understanding that Mr. Roberts had the authority to grant an *order*—what they term a 'verbal access order'—authorizing their entry." [Filing No. 74 at 21.] However, Mr. Shattuck argues, it was clearly established that a search warrant can only be issued by a judicial officer under certain circumstances, and this "verbal access order" concept was invented solely for this litigation. [Filing No. 74 at 21-22.]

To the extent Defendants do intend to rely on advice-of-counsel qualified immunity, Mr. Shattuck contends that they fail to respond to his previous argument that the doctrine does not apply in this case. [Filing No. 74 at 22.] Mr. Shattuck asserts that it was also clearly established that Defendants could not remain inside his home after learning that he was there, and their arguments to the contrary ignore three important principles of law: (1) consent may not be implied from an individual's mere silence or failure to object unless the totality of the circumstances so indicates; (2) consent is not voluntary when it is offered only in response to a claim of lawful authority; and (3) consent is not valid when it is tainted by an initial illegal entry. [Filing No. 74 at 22-23.] Mr. Shattuck also contends that Defendants' single-sentence argument that the Vigo County Defendants needed to stay inside the home to protect the safety of the DCS Defendants is "blatantly circular" and fails to provide objective evidence of a threat of imminent harm. [Filing No. 74 at 23.]

In their Reply, Defendants acknowledge that reliance on the advice of counsel does not entitle officials to qualified immunity in all circumstances, but only in extraordinary circumstances. [Filing No. 77 at 3-4.] Nevertheless, they argue, qualified immunity is appropriate in this case because: (1) Mr. Roberts is the Chief Deputy Prosecutor of Vigo County and had been employed with the County Prosecutor's Office for 19 years; (2) Defendants sought Mr. Roberts' advice "specifically tailored to the particular facts, as they reasonably understood them, including, for purposes of summary judgment, mistakes of fact"; and (3) although a "verbal access order" is not a recognized legal concept, Defendants reasonably believed that Mr. Roberts had given them permission to enter the Shattucks' home based on exigent circumstances. [Filing No. 77 at 4-5.]

The qualified immunity doctrine protects state officials from liability for money damages unless the plaintiff can show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations omitted). The plaintiff bears the burden of defeating a qualified immunity defense. *E.g.*, *Chasensky v. Walker*, 740 F.3d 1088, 1094 (7th Cir. 2014). For the reasons stated above, Mr. Shattuck has demonstrated that the Individual Defendants' violated his constitutional rights by entering his home and remaining inside until Mr. Shattuck initiated a separate conversation with the DCS Defendants in another room. The remaining questions are whether those rights were clearly established at the time of the violation and, if so, whether exceptional circumstances exist to justify the application of qualified immunity. The Court will address each in turn.

### i. Whether the Rights Were Clearly Established

"To be clearly established, at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing

violates that right . . . and existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012) (alteration in original). The Supreme Court has cautioned against defining clearly established law "at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citing *Ashcroft*, 563 U.S. at 743). Instead, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"The lack of specific precedent is not necessarily fatal to a qualified immunity defense because the Supreme Court has recognized that 'officials can still be on notice that their conduct violates established law . . . in novel factual circumstances.'" *Leiser v. Kloth*, 933 F.3d 696, 702 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 2722 (2020) (quoting *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377-78 (2009); *Hope v. Pelzer*, 536 U.S. 730, 741-42 (2002)). In the absence of a specific case on point, qualified immunity may nonetheless apply "where the state official's alleged conduct is so egregious that it is an obvious violation of a constitutional right." *Leiser*, 933 F.3d at 702. As the Supreme Court has explained, "'general statements of the law are not inherently incapable of giving fair and clear warning' to officers," and cases establishing general Fourth Amendment principles can create clearly established law in "an obvious case," provided that the unlawfulness of the action is apparent in light of preexisting precedent. *White*, 137 S. Ct. at 552 (citations omitted) (concluding that law was not clearly established where defendant's conduct did not "constitute[] a run-of-the-mill Fourth Amendment violation").

At the highest level of generality, this case involves several important yet basic principles of Fourth Amendment law: (1) that individuals have the right to refuse to answer the door or to speak to police officers who do not have a warrant, *King*, 563 U.S. at 469-70; (2) that without a warrant police cannot enter a private home unless one of the exceptions to the warrant requirement

is satisfied, such as consent or exigent circumstances, *e.g.*, *Payton*, 445 U.S. at 586; *Brigham City*, 547 U.S. at 403; and (3) that any consent authorizing a search must be voluntary, meaning not coerced and not tainted by an illegal entry, *Bumper*, 391 U.S. at 548-50; *Schneckloth*, 412 U.S at 222; *Robles-Ortega*, 348 F.3d 681.   These are certainly principles of which a reasonable police officer or child welfare official can be expected to be aware.   And *Venters*, *Bumper*, and *Robles-Ortega* apply these principles to facts similar to those at issue in this case.

    *Venters* involved a child services investigation into allegations of abuse or neglect.   The *Venters* Court was clear that knocks going unanswered or unsupervised children inside a home, by themselves, would not be sufficient to create exigent circumstances based on concern for a child's wellbeing, and that specific facts giving rise to a reasonable belief that a child is presently in danger are required.   Defendants do not meaningfully address *Venters* as it applies to the qualified immunity analysis.[13]   [*See* Filing No. 72 at 16-20; Filing No. 77 at 3-5.]   The Court concludes that *Venters*, as well as *Gillespie* and *Ford*, clearly established the principle that under the facts presented to the Individual Defendants—they heard a child's voice that did not exhibit any signs of distress, no one answered the door, and no other affirmative sign of exigency existed—exigent circumstances did not justify entry into the Shattucks' home.   Given Alicia's express denial of

---

[13] However, Defendants cite *Venters* in support of their argument that the Individual Defendants were justified in entering the Shattucks' home.   [Filing No. 72 at 9.]   They characterize *Venters* as merely holding that "[o]fficers had probable cause to enter an individual's home without a warrant after they were informed of potential abuse and neglect occurring within the home" because a "report filed by a grandmother of the allegedly neglected children provided information sufficient to support a showing of probable cause."   [Filing No. 72 at 9 (citing *Venters*, 539 F.3d at 804, 809).]   This is a misstatement of the holding and reasoning of *Venters*.   Entry in that case was justified not simply by the fact that officials were investigating a specific and credible report of child neglect (although they were), but when they arrived at the home, the report was corroborated by observable facts giving rise to a reasonable belief that emergency aid was necessary—officers saw that the home was cluttered, there were feces on the floor, and a child viewable from the window appeared to be nearly unresponsive and potentially in need of medical care directly related to methamphetamine exposure, which precipitated the report in the first place.

consent, without exigent circumstances, the Individual Defendants' belief that they had authority to enter the Shattucks' home was not reasonable.

Once the door was breached, the Individual Defendants no longer could have believed they had exigent circumstances justifying their entry into or remaining within the home, because they immediately learned that Mr. Shattuck was home and therefore no child was alone inside the house. Because the sole justification for their entry was purported exigent circumstances, once those circumstances ceased to exist, the situation became "an obvious case."  Absent any remaining potential justification, the Individual Defendants could not have believed that they had a lawful basis for crossing the threshold into the home.

*Bumper* and *Robeles-Ortega* clearly establish that the Individual Defendants' subsequent actions were similarly unlawful.  In *Bumper*, four law enforcement officers arrived at the defendant's grandmother's house and one "announced, 'I have a search warrant to search your house,'" which was enough to convince the grandmother to let the officers in.  391 U.S. at 546. Those facts are sufficiently similar to what occurred here to put the Individual Defendants on notice that it is unlawful to conduct a search based on a false representation of lawful authority. For example, Lieutenant Anderson stated, "We got an oral order," and explained that Mr. Roberts gave them permission to enter, [Filing No. 65-2 at 0:48-1:10]; Ms. Pherson said to Mr. Shattuck, "Sir, they called the prosecutor on the phone and got an order," [Filing No. 65-2 at 1:26-1:33]; and Lieutenant Anderson asserted that Mr. Roberts said "If they don't open the door and you have heard somebody in there, kick the door in, fill out the paperwork, search warrant, no problem," [Filing No. 65-2 at 7:30-8:03].  In light of *Bumper*, it was clearly established that these false representations were an improper means to secure consent.

Finally, *Robeles-Ortega* clearly established that consent obtained immediately following a forceful illegal entry, with no intervening circumstances, is tainted and therefore invalid. The only significant distinction between the facts of *Robeles-Ortega* and the circumstances of this case is that the Vigo County Defendants did not draw their weapons or order anyone to lay on the floor. However, this difference is not significant enough to change the qualified immunity analysis because the Vigo County Defendants nonetheless engaged in a show of force by physically breaking down the door, and they had weapons on them when they did so. The circumstances of this case are such that, under *Robeles-Ortega*, it was clearly established that Mr. Shattuck did not validly consent to the Individual Defendants' presence in his home.

## ii.  Whether Extraordinary Circumstances Existed

The Supreme Court has recognized that, even where the law is clearly established, an officer might still be entitled to qualified immunity if he can demonstrate extraordinary circumstances. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982) ("If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained."). Although reliance on the advice of counsel is not inherently extraordinary, in some circumstances reliance on advice of counsel may satisfy the extraordinary circumstances exception. *Davis v. Zirkelbach*, 149 F.3d 614, 620 (7th Cir. 1998) (citing *V–1 Oil Co. v. Wyoming*, 902 F.2d 1482, 1488-89 (10th Cir. 1990)). Relevant factors that a court should consider in determining whether the exception is satisfied "include how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was, whether complete information had been provided to the advising

attorney(s), the prominence and competence of the attorney(s), and how soon after the advice was received the disputed action was taken." *Davis*, 149 F.3d at 620 (quoting *V–1 Oil Co.*, 902 F.2d at 1488-89).  Although consulting a prosecutor does not give officers absolute immunity from suit, "it goes far to establish qualified immunity."  *Zimmerman v. Doran*, 807 F.3d 178, 183 (7th Cir. 2015) (citations omitted).

Defendants emphasize Mr. Roberts' experience and qualifications.  [*E.g.*, Filing No. 72 at 19 (asserting that the Individual Defendants "did not just consult any prosecutor; rather, they contacted the Vigo County Chief Deputy Prosecutor, a 19 year veteran who, among his other roles, trains local law enforcement, including the Vigo County Sheriff's Department").]  The Court has no reason to Mr. Roberts' credentials, but even the most experienced and qualified attorneys are capable of providing mistaken advice, especially when they are not provided with a complete picture of the existing circumstances.  The Individual Defendants did not tell Mr. Roberts that the allegations suggested that Mr. Shattuck was often home with S.S., or that his car was in the driveway.  They did not call Mr. Roberts again after Alicia arrived on the scene and expressly refused consent to entry.  These facts weigh against a finding of extraordinary circumstances.

Furthermore, Defendants do not respond to Mr. Shattuck's arguments that the Individual Defendants were in a better position than Mr. Roberts to assess the totality of the circumstances, or that qualified immunity based on advice of counsel is predominantly invoked where the legal advice at issue concerns especially complex matters.  [*See* Filing No. 67 at 35 (citing *Zimmerman*, 807 F.3d at 183 (legal issue involving the relative property rights of a property owner and the possessor of a timber deed); *Morrell v. Mock*, 270 F.3d 1090, 1101 (7th Cir. 2001) (legal advice regarding which of two contradictory custody orders from different state court actions controlled);

*Davis*, 149 F.3d at 620 (legal advice involving whether a tape recorded by defendant's employer could be used to prosecute defendant under relevant wiretap statutes)).]

"The objective reasonableness of a person's reliance on advice should be evaluated in light of what he reasonably is expected to know." *Finch v. City of Indianapolis*, 886 F. Supp. 2d 945, 980 (S.D. Ind. 2012).  The Individual Defendants reasonably should have known that the exigent circumstances exception requires some affirmative sign of exigency.  They should have known that conveying incomplete information to Mr. Roberts could have resulted in inaccurate advice.  And given the passage of time and the events that took place outside the Shattucks' home—including Alicia's arrival, which left both the Shattucks' vehicles accounted for and in no way supported the erroneous belief that S.S. was inside alone—their reliance on Mr. Roberts' advice was not reasonable.[14]  Accordingly, the Court concludes that no extraordinary circumstances exist, and qualified immunity does not apply to shield the Individual Defendants from liability on Mr. Shattuck's Fourth Amendment illegal entry claim.

In addition, the undisputed facts show that the Individual Defendants did not consult Mr. Roberts regarding what they should do in the event that they located Mr. Shattuck inside the home, or whether they had permission to remain in the home to interview S.S. even if her parents

---

[14] Defendants also assert that the Individual Defendants "believed they had a verbal access order to enter the residence and that exigent circumstances then existed authorizing a warrantless entry." [Filing No. 72 at 19.] They acknowledge that the term "verbal access order" is legally meaningless, "does not appear in a single decision, state or federal, available through Westlaw," and a Google search of the term yields no results, yet they argue that they "reasonably understood Mr. Roberts' (sic) to be providing them just such an authorization." [Filing No. 77 at 9.]  To the extent the Individual Defendants intend to assert that they believed Mr. Roberts granted them some kind of oral order akin to a search warrant authorizing their entry, that belief was unreasonable because, as they acknowledge, no such order exists and Mr. Roberts is not a judicial officer.  To the extent that "verbal access order" is used merely as a shorthand to convey the idea that they relied on Mr. Roberts' opinion that exigent circumstances existed, that reliance was not reasonable for the reasons stated above.

objected. Accordingly, Mr. Roberts' advice cannot constitute an extraordinary circumstance justifying the crossing of the threshold after learning that Mr. Shattuck was home or remaining inside the home to interview S.S.

In sum, given that the Individual Defendants violated Mr. Shattuck's clearly established constitutional rights and no extraordinary circumstances exist, Mr. Shattuck's Initial Motion for Summary Judgment is **GRANTED** as to his Fourth Amendment claims as limited herein (related to entering the home and remaining inside until Mr. Shattuck initiated a separate conversation with the DCS Defendants in another room).

### 2. <u>State Law Claims</u>

In his Initial Motion, Mr. Shattuck argues that the actions of the Vigo County Defendants constitute the torts of trespass and false imprisonment under Indiana law, for which the Vigo County Sheriff ("<u>the Sheriff</u>") is liable as their employer. [Filing No. 67 at 37-40.] Specifically, Mr. Shattuck contends that the Sheriff is not entitled to law enforcement immunity under the Indiana Tort Claims Act ("<u>ITCA</u>") because: (1) the immunity provision expressly does not apply to false imprisonment claims; and (2) the Vigo County Defendants were not enforcing a law when they entered and remained in the Shattucks' home. [Filing No. 67 at 37-38.] As to the merits of the claims, Mr. Shattuck asserts that his trespass claim is coextensive with his claim that Defendants violated the Fourth Amendment when entering his house. [Filing No. 67 at 39.] Mr. Shattuck argues that the Vigo County Defendants' actions amount to false imprisonment because they unlawfully restrained him inside his own home without his consent. [Filing No. 67 at 39-40.]

In their Cross-Motion/Response, Defendants argue that Mr. Shattuck's state tort claims are barred by law enforcement immunity under the ITCA because the Vigo County Defendants were enforcing the law and acting within the scope of their employment by assisting with a DCS

investigation.  [Filing No. 72 at 21.]  Defendants also argue that Mr. Shattuck was not falsely imprisoned because the Individual Defendants had probable cause and exigent circumstances justifying their entry into the Shattucks' home and their remaining inside the home, and because they were acting in good faith throughout the duration of the incident.  [Filing No. 72 at 22-23.]

In his Response/Reply, Mr. Shattuck maintains that the Sheriff is not entitled to law enforcement immunity because the Vigo County Defendants were not enforcing the law within the meaning of the ITCA when they entered and remained in Mr. Shattuck's home.  [Filing No. 74 at 23-24.]  Mr. Shattuck also reiterates his argument that the actions of the Vigo County Defendants constitute trespass and false imprisonment under Indiana law, for which the Sheriff is liable.  [Filing No. 74 at 24-25.]  Mr. Shattuck asserts that Defendants' proposed "'good faith' defense appears to only apply to reasonable, if ultimately erroneous, determinations that a seizure was justified by probable cause or reasonable suspicion," but Defendants do not meaningfully elaborate on this argument or identify any criminal statute that Mr. Shattuck was believed to have violated, as would be necessary to evaluate any claim that probable cause existed.  [Filing No. 74 at 25-26.]  Even if such a defense could apply in this context, Mr. Shattuck argues, given the clearly established law controlling this case, any belief by the Vigo County Defendants that their conduct was permissible is simply not reasonable.  [Filing No. 74 at 26.]

In their Reply, Defendants reiterate their argument that the Vigo County Defendants accompanying the DCS Defendants to investigate allegations of child abuse constitutes a law enforcement activity within the meaning of the ITCA.  [Filing No. 77 at 7-8.]  Regarding the false imprisonment claim, Defendants maintain that the "Vigo County Defendants had a good faith belief probable cause existed for them to enter [Mr.] Shattuck's home and their belief was reasonable" based on the circumstances, and the "criminal statutes involved could include those

related to child abuse or neglect depending on what was found upon entry into the home." [Filing No. 77 at 8-9.]

      *a. Law Enforcement Immunity Under the ITCA*

The ITCA, Ind. Code § 34-13-3-1 *et. seq*., governs state law tort claims against governmental entities and public employees. *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003). "Among other things the statute provides substantial immunity for conduct within the scope of the employee's employment." *Id*. Specifically, "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Ind. Code § 34-13-3-5(b); *see also Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014) ("Under the [ITCA], there is no remedy against the individual employee so long as he was acting within the scope of his employment.").

In addition, the law enforcement immunity provision of the ITCA provides that a "governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . .  [t]he adoption and enforcement of or failure to adopt or enforce . . . a law . . . unless the act of enforcement constitutes false arrest or false imprisonment." Ind. Code § 34-13-3-3(8)(A).  In determining whether this provision immunizes a police officer's conduct, a court must determine whether: (1) the officer was acting within the scope of his employment when the injury to plaintiff occurred; and (2) whether the officer was engaged in the enforcement of a law at that time. *Snyder v. Smith*, 7 F. Supp. 3d 842, 874 (S.D. Ind. 2014) (citing *Harness v. Schmitt*, 924 N.E.2d 162, 165 (Ind. Ct. App. 2010)).  "[T]he party seeking immunity bears the burden of demonstrating that its conduct is within the protection afforded by the ITCA." *F.D. v. Indiana Dep't of Child Servs.*, 1 N.E.3d 131, 136 (Ind. 2013).

Indiana Code § 34-13-3-3 does not define "enforcement of a law."  The Indiana Supreme Court has explained that "what [is] required to establish immunity [is] that the activity be one in which government either compels obedience to laws, rules, or regulations or sanctions or attempts to sanction violations thereof." *Davis v. Animal Control--City of Evansville*, 948 N.E.2d 1161, 1164 (Ind. 2011) (discussing *Mullin v. Municipal City of South Bend*, 639 N.E.2d 278 (Ind. 1994), *limited on other grounds by Benton v. City of Oakland City*, 721 N.E.2d 224, 231 (Ind. 1999)).

Activities that constitute enforcement of a law (or failure to enforce a law) include:

- investigating potential crimes, *Snyder v. Smith*, 7 F. Supp. 3d 842, 875 (S.D. Ind. 2014);

- executing a valid search warrant, *Brown v. City of Fort Wayne*, 752 F. Supp. 2d 925, 944 (N.D. Ind. 2010) (citing cases);

- police mishandling child abuse reports, including negligently investigating and failing to pursue delinquency charges against a suspected child molester, *Indiana Dep't of Child Servs.*, 1 N.E.3d at 139;

- animal control failing to follow procedures outlined in an ordinance prohibiting the possession of dangerous animals, *Davis*, 948 N.E.2d at 1165;

- police accompanying a private individual to serve an eviction notice in order to prevent a breach of the peace, *Harness v. Schmitt*, 924 N.E.2d 162, 167–68 (Ind. Ct. App. 2010);

- government officials deciding whether to detain a mentally ill and dangerous person pursuant to statute providing for such detention, *Savieo v. City of New Haven*, 824 N.E.2d 1272, 1276 (Ind. Ct. App. 2005);

- police responding to a paramedic's request to assist in restraining combative patients who need medical treatment, *Daggett v. Indiana State Police*, 812 N.E.2d 1151, 1154 (Ind. Ct. App. 2004);

- police department failing to enforce the terms of a bond order, resulting in erroneous release of a criminal defendant, *St. Joseph Cty. Police Dep't v. Shumaker*, 812 N.E.2d 1143, 1151 (Ind. Ct. App. 2004);

- police deciding not to arrest a suspect, *City of Hammond v. Reffitt*, 789 N.E.2d 998, 1003 (Ind. Ct. App. 2003);

- police arresting a suspect, *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002); and

- police pursuing a fleeing suspect into a private home, *O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. Ct. App. 2000).

Conversely, activities that do not constitute law enforcement include:

- a police officer serving civil process, *Loveless v. McCorkle*, 2018 WL 4509608, at *9 (S.D. Ind. Sept. 20, 2018);

- a school district providing for school security, *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 483 (Ind. 2003); and

- a dispatcher handling a call regarding a fire emergency, *Mullin*, 639 N.E.2d at 283.[15]

    In their Cross-Motion/Response, Defendants do not meaningfully develop their law enforcement immunity argument, and instead merely assert that "[e]ntering and remaining in [Mr.] Shattuck's home was within the Vigo County Defendants['] scope of employment" and the "Vigo County Defendants were also enforcing the law while assisting with the assessment." [Filing No. 72 at 21.] There is no dispute that the Vigo County Defendants were acting within the scope of their employment. As for the latter assertion, however, in addition to being a woefully underdeveloped argument by the party bearing the burden on this issue, this assertion amounts to a mischaracterization of the undisputed facts. The Vigo County Defendants were not called to the

---

[15] While Defendants' state law immunity arguments are based solely on statutory law enforcement immunity, [Filing No. 72 at 21], in their Reply they cite a case discussing common law governmental immunity, [Filing No. 77 at 7-8 (citing *Savieo v. City of New Haven*, 824 N.E.2d 1272, 1277 (Ind. Ct. App. 2005))]. The Indiana Supreme Court has recognized that common law tort immunity for governmental entities has been almost entirely abolished in Indiana, with three limited exceptions in which common law sovereign immunity still exists: "crime prevention, appointments to public office, and judicial decision-making." *Indiana Dep't of Child Servs.*, 1 N.E.3d at 135-36 (citing *Benton*, 721 N.E.2d at 227). The Court need not address whether common law governmental immunity could apply in this case because it is a waivable affirmative defense, *see City of S. Bend v. Dollahan*, 918 N.E.2d 343, 349 (Ind. Ct. App. 2009), which Defendants did not explicitly raise or develop any meaningful arguments in support thereof, *e.g.*, *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) ("underdeveloped arguments are considered waived").

Shattucks' home or otherwise consulted to assist with DCS's investigation into the allegations against Mr. Shattuck.   Indeed, Lieutenant Anderson acknowledged that the Vigo County Defendants "ain't got nothin' to do with DCS" and suggested that they were only present because DCS informed them of a potential emergency, believing that S.S. could be inside the home alone. [Filing No. 65-2 at 7:30-8:03.]  In this way, the Vigo County Defendants' actions were more akin to the dispatcher responding to a call regarding a fire emergency in *Mullin* than to police's investigation of criminal activity at issue in *Snyder*, *Brown*, *Indiana Department of Child Services*, and *Davis*.

Two other cases merit discussion.  In *Harness*, the court "decline[d] to hold an officer's presence at a place where a breach of the peace might be anticipated is, as a matter of law, outside the definition of 'law enforcement.'"  924 N.E.2d at 167.   In concluding that a police officer accompanying a private individual to serve an eviction notice constituted enforcing a law, the court observed that "it is a 'routine part' of a police officer's job to accompany private individuals in situations where there is a concern that a breach of the peace might arise." *Id*. at 168.  Mr. Shattuck asks the Court not to follow *Harness* because, he asserts, its outcome rests on a "shaky foundation" to the extent it cites another appellate decision that has since been "disapproved by the Indiana Supreme Court." [Filing No. 67 at 38 n.13.]  Regardless of whether that is true, however, *Harness* is not dispositive for a more fundamental reason—the Vigo County Defendants were not accompanying the DCS Defendants with the intention of preventing a breach of the peace.  The Vigo County Defendants were responding to a perceived emergency, and integral to their perception of the emergency was the belief that Mr. Shattuck was not home.  The Individual

Defendants cannot simultaneously argue that they believed Mr. Shattuck was not home and that their entry into his home was justified by the belief that he might breach the peace.[16]

For the same reason, *Daggett* also does not demonstrate that immunity should apply in this case. In *Daggett*, officers were responding to an emergency call, but the nature of the emergency was that a patient was combative, uncooperative, and posing a threat to the paramedics treating him and to others around him. *See* 812 N.E.2d at 1152. The officers' actions in restraining the patient amounted to an attempt to prevent him from assaulting others and to enforce a statute that criminalized interference with emergency personnel in their performance of emergency services. *Id.* at 1153. In this case, on the other hand, the Vigo County Defendants were responding to a call that a child was potentially home alone. Entering the home to respond to that emergency would have entailed protecting a child from potential injury, not preventing a potential crime.

Accordingly, statutory law enforcement immunity does not apply to bar Mr. Shattuck's common law trespass claim. The immunity provision, by its express terms, also does not apply to his false imprisonment claim. The Court will therefore address the merits of each of these claims in turn.

>   b. *Trespass*

In order to establish a claim for trespass, a plaintiff must prove two elements: (1) that he was in possession of the land at the time when the trespass occurred; and (2) that the trespassing defendant entered the land without the legal right to do so. *KB Home Indiana Inc. v. Rockville*

---

[16] To the extent that the Vigo County Defendants argue that their presence in the Shattucks' home was necessary to protect the DCS Defendants, that argument is not relevant to the issue of law enforcement immunity for a claim of trespass, because the purported need to protect the DCS Defendants did not arise until after the Individual Defendants were already inside the home. Mr. Shattuck's claim related to the time period when the Individual Defendants were inside the home is one of false imprisonment, which is expressly excepted from the law enforcement immunity provision regardless of why they were there.

*TBD Corp.*, 928 N.E.2d 297, 308 (Ind. Ct. App. 2010). "Law enforcement officers who enter premises without authority are subject to common law trespass actions." *Turner v. Sheriff of Marion Cty.*, 94 F. Supp. 2d 966, 984 (S.D. Ind. 2000) (citing cases); *see also Bentz v. City of Kendallville*, 577 F.3d 776, 783 (7th Cir. 2009) ("We do not doubt that if the police lacked probable cause to enter [plaintiff's] home, the facts he alleged could form the basis for either [trespass or invasion of privacy under Indiana law].")

There is no dispute that Mr. Shattuck was in possession of his home when the Vigo County Defendants entered it. And for the reasons articulated above, the Vigo County Defendants entered Mr. Shattuck's home without a legal right to do so. Accordingly, they committed the tort of trespass under Indiana law. Mr. Shattuck's Initial Motion for Summary Judgment is **GRANTED** as to this claim.

      c.  *False Imprisonment*

Initially, the Court notes that Defendants' brief references both false imprisonment and false arrest and asserts that probable cause existed as a defense to false arrest. [Filing No. 72 at 22-23.] Although analysis of these two torts often overlaps where a plaintiff is arrested, *see Row v. Holt*, 864 N.E.2d 1011, 1016 n.4 (Ind. 2007) (explaining that where a claim of false imprisonment arises from an allegedly false arrest, courts need not conduct a separate analysis of the former), and the caselaw does not always clearly preserve the distinction between the two torts, *see Bentz v. City of Kendallville*, 577 F.3d 776, 780 (7th Cir. 2009) (citing cases and observing that "Indiana courts have used the terms 'false arrest' and 'false imprisonment' interchangeably when a plaintiff's claim stems from detention by authorities without probable cause"),[17] Mr.

---

[17] It seems that "detention by authorities" as used in this context means an arrest and the resulting confinement, because the cases cited in support of this proposition all involved an arrest. *See Trobaugh v. Hellman*, 564 N.E.2d 285, 286 (Ind. Ct. App. 1990) ("false imprisonment" claim

Shattuck was not arrested and only asserts a claim for false imprisonment,  [Filing No. 32 at 6; Filing No. 64; Filing No. 67 at 37-40.]  Accordingly, the Court will apply the standard for false imprisonment only.  *See Shroyer v. United States*, 904 F. Supp. 2d 914, 926 (N.D. Ind. 2012) ("Although false arrest and false imprisonment are claims that Indiana courts treat interchangeably, they are distinct causes of action when there has been no arrest made under the pretense of legal authority.").

"False imprisonment is the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent." *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002) (citing *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 967 (Ind. Ct. App. 2001)).  "False imprisonment may be committed by words alone, or by acts alone, or by both and by merely operating on the will of the individual, or by personal violence, or both." *Dietz,* 754 N.E.2d at 967 (quoting 35 C.J.S. False Imprisonment § 14, at 444 (1999)).

Defendants do not appear to dispute that by remaining inside Mr. Shattuck's home, the Individual Defendants were restricting his movement, as they do not address that element in their briefing.  [*See* Filing No. 72 at 22-23; Filing No. 77 at 8-9.]  Nevertheless, the Court concludes that this element is satisfied.  Upon entering the home, the Individual Defendants patted Mr.

---

based on plaintiff being handcuffed, driven to a police station for blood alcohol testing, and subsequently detained on a charge of operating a vehicle while intoxicated); *Delk v. Bd. of Comm'rs of Delaware Cty.*, 503 N.E.2d 436, 439 (Ind. Ct. App. 1987) ("false imprisonment" claim where the plaintiff "was seized, handcuffed, and taken against her will to the Delaware County Jail"); *Grooms v. Fervida*, 182 Ind. App. 664, 666, 396 N.E.2d 405, 407 (1979) ("false imprisonment" claim related to length of detention following arrest); *Mitchell v. Drake*, 360 N.E.2d 195, 196 (Ind. Ct. App. 1977) ("false imprisonment" claim based on arrest and detention pursuant to criminal statute that was later ruled unconstitutional).  The point the Seventh Circuit was making in *Bentz* is that Indiana courts sometimes refer to the tort of "false arrest" by the name "false imprisonment."  The opposite does not appear to be true, because while "false arrest is one means of committing a false imprisonment," *Bentz*, 577 F.3d at 780, not every false imprisonment is a false arrest.

Shattuck down and kept him in the living room, at least until he until he initiated a conversation with the DCS Defendants in a separate room. *See Wallace v. Kato*, 549 U.S. 384, 388-89 (2007) ("Every confinement of the person is an imprisonment, whether it be in a common prison or in a private house, or in the stocks, or even by forcibly detaining one in the public streets; and when a man is lawfully in a house, it is imprisonment to prevent him from leaving the room in which he is.") (quoting M. Newell, Law of Malicious Prosecution, False Imprisonment, and Abuse of Legal Process § 2, p. 57 (1892)); *Delk v. Bd. of Comm'rs of Delaware Cty.*, 503 N.E.2d 436, 439 (Ind. Ct. App. 1987) (recognizing that to prove this element, a plaintiff need only show that his freedom of movement was "in some manner restricted," and citing as an example a police officer grabbing an individual's arm, stopping the individual's forward progress, and "demanded[ing] in a stern and firm voice carrying authority" that the individual accompany him back to a store). In addition, for the reasons articulated above, Mr. Shattuck did not consent to this restriction or to the Individual Defendants' presence inside his home, at least up until the point that he initiated a conversation with the DCS Defendants in a separate room.

As for the lawfulness of the Individual Defendants' presence, the Court has already explained how the Individual Defendants' actions in entering and remaining within the home until Mr. Shattuck initiated a conversation with the DCS Defendants in a separate room were unlawful in that they violated the Fourth Amendment. In support of their argument that Mr. Shattuck was not "falsely" detained, Defendants reiterate that the "Vigo County Defendants had exigent circumstances and probable cause to enter and remain in the Shattuck residence." [Filing No. 72 at 22.] The Court has already rejected the exigent circumstances argument. Further, as stated above, probable cause (or lack thereof) is not an element of a false imprisonment claim not premised on an arrest. Defendants do not elaborate on what probable cause purportedly existed.

"[P]robable cause is '"a reasonable ground for belief of guilt"' that is 'particularized with respect to the person to be searched or seized.'" *Hawkins v. Mitchell*, 756 F.3d 983, 994 (7th Cir. 2014) (quoting *Maryland v. Pringle*, 540 U.S. 366 (2003)). Furthermore, "[t]he existence of probable cause . . . depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law." *Hawkins*, 756 F.3d at 994 (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 715 (7th Cir. 2013)). Defendants do not identify any crime that they supposedly had probable cause to believe Mr. Shattuck committed or was committing, or discuss how the facts align with the elements of any crime. To the extent they assert that the "criminal statutes involved could include those related to child abuse or neglect depending on what was found upon entry into the home," [Filing No. 77 at 8-9], that argument misses the point entirely. First, as noted above, the Report Source's allegations were not sufficient to give the Individual Defendants probable cause to believe that a crime had been committed. Second, given that the Individual Defendants' entry into the home was solely premised on their purported belief that S.S. was alone inside, they cannot now argue that they had any cause to believe Mr. Shattuck was inside committing a crime. Third, the only things that were "found upon entry into the home" were an unharmed S.S. and Mr. Shattuck—no evidence of criminal activity was observed. Defendants point to nothing that justified their presence in the home.

Finally, Defendants assert that the Vigo County Defendants were acting in good faith, which precludes the Sheriff's liability for false imprisonment. As Mr. Shattuck points out, the cases cited by Defendants establishing that defense appear to only apply to cases in which police officers reasonably but erroneously believed that probable cause existed to justify an arrest. *See Trobaugh v. Hellman*, 564 N.E.2d 285, 286 (Ind. Ct. App. 1990) (considering "[w]hether the evidence was sufficient to show [the officer] did not have a good faith belief that probable cause

existed to arrest [plaintiff] for operating a vehicle while intoxicated"); *Delk,* 503 N.E.2d at 439

("[T]he affirmative defense of good faith shields the arresting officer from liability for an unlawful

seizure based upon a mistaken identification of the person named in the attachment or warrant if

the officer has exercised reasonable diligence and care in ascertaining identity before serving the

warrant.").[18] Regardless, any potential good faith defense is tied to the notion of reasonableness.

As outlined in this Order, the Individual Defendants' actions in entering and remaining in Mr.

Shattuck's home were not objectively reasonable, and therefore they were not acting in good faith.

In sum, the Vigo County Defendants falsely imprisoned Mr. Shattuck, and the Sheriff is

liable as their employer.  Mr. Shattuck's Initial Motion for Summary Judgment is **GRANTED** as

to the false imprisonment claim against the Sheriff.

### 3.  Damages

In his Initial Motion, Mr. Shattuck argues that he is entitled on summary judgment to

$2,199.00 in damages.  [Filing No. 67 at 40-42.]  Specifically, he asserts that he sustained $733.00

in physical damage to his home and, because the actions of the Vigo County Defendants[19]

constitute the crimes of criminal mischief and residential entry under Indiana law, he is entitled to

a treble-damages award totaling $2,199.00 pursuant to Indiana's Crime Victims Relief Act

("CVRA").  [Filing No. 67 at 40-41.]  Mr. Shattuck asserts that all Defendants are jointly and

severally liable for the $733.00, and only the Vigo County Defendants are jointly and severally

---

[18] Defendants also cite *Roddel v. Town of Flora*, 580 N.E.2d 255, 259 (Ind. Ct. App. 1991), which discusses false arrest and probable cause but not the good faith defense.

[19] Mr. Shattuck uses the term "individual law enforcement defendants," which the Court interprets to include only the Vigo County Defendants, not the DCS Defendants.  [*See* Filing No. 64 at 1 (Mr. Shattuck's Statement of Claims asserting that "[t]he actions of Lt. Anderson, Dep. Decker, and Dep. Pirtle . . . constitute the crimes of criminal mischief and residential entry, and these defendants are therefore liable to the plaintiff under [the CVRA]").]

liable for the additional $1,466.00 in exemplary damages. [Filing No. 67 at 40-42; Filing No. 67 at 42 n.14.] Mr. Shattuck acknowledges that treble damages under the CVRA are discretionary but argues that "[g]iven the meager amount of the actual property damage, a full treble-damages award in necessary to possess any deterrent value[, a]nd ensuring that this award possesses the maximum deterrent value is particularly appropriate where the criminal act was committed by law enforcement officers who are unlikely to face criminal liability for their actions." [Filing No. 67 at 42 n.14.]

Although Defendants seek summary judgment based on their arguments that they are not liable on any of Mr. Shattuck's claims, they do not separately address any of Mr. Shattuck's arguments concerning damages. [*See* Filing No. 72; Filing No. 77.]

a.  *Actual Damages*

"Legal damages, like liability, can be determined via the summary judgment mechanism." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 795 (7th Cir. 2014). "If all the material issues of fact underlying a claim, including the amount of damages, are established and on the basis of applicable substantive law the claimant is entitled to judgment, a summary judgment including the award of damages may be appropriately rendered." *Id.* (quoting *Sahagian v. Dickey*, 827 F.2d 90, 100 n. 8 (7th Cir. 1987)).

Given the complete absence of any conflicting evidence or argument to the contrary, the Court concludes that Mr. Shattuck is entitled to $733.00 in damages for the physical damage to his front door. All Defendants are jointly and severally liable for this amount, because all five of the Individual Defendants participated in the illegal entry giving rise to the Fourth Amendment claim, and the Sheriff is liable for the Vigo County Defendants' trespass under state law. *See, e.g.*, *Harper v. Albert*, 400 F.3d 1052, 1061-62 (7th Cir. 2005) (explaining that joint and several liability is

appropriate where "each defendant acted in concert to 'produce a single, indivisible injury'") (citations omitted). Mr. Shattuck's Initial Motion for Summary Judgment is **GRANTED** to the extent that it seeks $733.00 in damages.

### b. Exemplary Damages under the CVRA

Under the CVRA, if a person suffers a pecuniary loss as a result of a violation of certain criminal statutes—including those establishing offenses against property under Indiana Code 35-43—the person can bring a civil action against the defendant who caused the loss for an amount not to exceed three times the actual damages suffered. Ind. Code § 34-24-3-1(1)(a); *see also Gilliana v. Paniaguas*, 708 N.E.2d 895, 899 (Ind. Ct. App. 1999) ("The Indiana crime victim's relief act allows treble damages in certain civil actions by crime victims."). CVRA liability "does not require criminal charges or proof beyond reasonable doubt." *Wysocki v. Johnson*, 18 N.E.3d 600, 606 (Ind. 2014). Instead, a claimant need only prove each element of the crime by a preponderance of the evidence. *Id.* (citing *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 334 (Ind. 2013)).

As the Indiana Supreme Court has observed, trial courts acting as the factfinder have considerable discretion in deciding whether and to what extent damages should be awarded under the CVRA. *See Wysocki*, 18 N.E.3d at 604-07. "Even when a plaintiff proves a predicate crime under the [CVRA], the trial court has discretion not to award exemplary damages when it thinks the conduct is not egregious enough to warrant punishment." *Id.* at 601; *see also id.* at 605 (recognizing that "the 'heinousness' of the defendant's conduct may properly factor into the factfinder's decision whether to award exemplary damages"). "And when a plaintiff pleads several alternative grounds for relief, the trial court has similar discretion not to impose CVRA liability *at all*, even when it awards compensatory damages under a different theory." *Id.* at 601. In other

words, "when the pleadings give the trial court a choice between an intentional tort and the quasi-criminal CVRA, the court necessarily has discretion to choose tort liability and reject quasi-criminal liability—even when, as here, the criminal offense and civil tort are . . . closely related." *Id*. at 605 (affirming the trial court's decision following a bench trial to award damages for the common law tort of fraudulent misrepresentation and reject a related claim for damages under the CVRA based on the crime of deception); *see also Smith v. Hearn*, 2020 WL 1309987, at *6 (N.D. Ind. Mar. 19, 2020) (recognizing that "before a trial court can award exemplary damages (including treble damages) under the CVRA, there must be a finding that the defendant's actions were 'so heinous as to require exemplary damages,' or 'warrant quasi-criminal CVRA liability'").  Because the state cannot commit a crime, damages under the CVRA cannot be recovered from the government.  *State v. Ziliak*, 464 N.E.2d 929, 930 (Ind. Ct. App. 1984).

Mr. Shattuck asserts that the Vigo County Defendants committed residential entry and criminal mischief.  "A person who knowingly or intentionally breaks and enters the dwelling of another person commits residential entry . . . ."  Ind. Code § 35-43-2-1.5.  The "breaking and entering" element requires evidence demonstrating that "the slightest force was used to gain unauthorized entry."  *McKinney v. State*, 653 N.E.2d 115, 117 (Ind. Ct. App. 1995) (noting that opening an unlocked door was sufficient).  For the reasons already explained in this Order, the undisputed facts demonstrate that the Vigo County Defendants intentionally and forcibly entered Mr. Shattuck's home without any legal right or authorization.  This is sufficient for the Court to conclude that the Vigo County Defendants committed residential entry for purposes of the CVRA.

Furthermore, "[a] person who recklessly, knowingly, or intentionally damages or defaces property of another person without the other person's consent commits criminal mischief."  Ind. Code § 35-43-1-2(a).  The undisputed facts demonstrate that Deputy Decker intentionally damaged

Mr. Shattuck's door without Mr. Shattuck's consent.   Accordingly, for purposes of the CVRA, Deputy Decker committed criminal mischief.

The question remains, however, whether the Vigo County Defendants' actions were so "heinous" as to warrant quasi-criminal liability or exemplary damages under the CVRA.  That is a question that must be answered by a factfinder, and therefore may not be decided by the Court on summary judgment.  *See Smith*, 2020 WL 1309987, at *6 ("Of course the [plaintiffs] will have to prove damages at trial, and that will also be the time to determine the nature and extent of [the defendant's] culpability, if any, and available damages.").  Mr. Shattuck's Initial Motion for Summary Judgment is therefore **GRANTED** to the extent that the Court concludes that the Vigo County Defendants' action constitution crimes for purposes of the CVRA, but the motion is **DENIED** to the extent that the issue of exemplary damages must be resolved at trial.

### B.  Defendants' Cross-Motion for Summary Judgment

As Mr. Shattuck points out in his Response/Reply, Defendants' Cross-Motion improperly relies upon disputed facts, at least with respect to Mr. Shattuck's Fourth Amendment illegal entry and state law trespass claims.  Specifically, in their Cross-Motion/Response, Defendants assert in their "Statement of Material Facts Not In Dispute" that "Pherson and Hill heard a female child's voice say 'Mommy'" after they knocked on the Shattucks' door and "Dep[uty] Decker heard a child's voice while walking around the house." [Filing No. 72 at 3.] Defendants also do not address the possibility that Mr. Shattuck was communicating with two of the Individual Defendants through the door prior to the forced entry.  Mr. Shattuck's testimony, however, expressly states that S.S. did not speak while the Individual Defendants were outside his home, there was no noise that could have been mistaken for a child's voice, and he yelled through the front door to the officers outside.  [Filing No. 65-5 at 2-3; Filing No. 74-2 at 3-4; Filing No. 74-2 at 7.]  In their

Reply, Defendants concede that "when drawing all reasonable inferences in favor of the non-moving party, factual disputes exist concerning several of Defendants' material facts, in whole or part" and therefore they "withdraw their reliance" on the disputed facts.[20] [Filing No. 77 at 2.] Resolving these disputes in favor of Mr. Shattuck—which the Court would be required to do in considering Defendants' Cross-Motion—would entirely eliminate the basis for Defendants' exigent circumstances argument, because the Court would be required to assume that the Individual Defendants did not hear a child's voice and spoke to Mr. Shattuck through the door prior to forcing entry.  More fundamentally, because Defendants do not concede to Mr. Shattuck's version of the facts for purposes of summary judgment, the dispute precludes the Court from granting Defendants' Cross-Motion as to liability on the Fourth Amendment illegal entry and state law trespass claims.  The Court cautions counsel for Defendants that ignoring the standard of review and hoping the Court will do the same is not a proper litigation tactic, as it wastes the Court's and the parties' time and resources.  *See Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) (reprimanding a party for "bas[ing] its litigation strategy on the hope that neither the district court nor [the appellate court] would take the time to check the record," and stating that such "shenanigans" destroy credibility with the court and are "both costly and wasteful").

The remaining material facts are undisputed.  Accordingly, considering Defendants' Cross-Motion as it relates to Mr. Shattuck's remaining claims would entail essentially the same analysis as already outlined above in addressing Mr. Shattuck's Initial Motion.  For all the reasons detailed

---

[20] Defendants attempt to preserve their reliance on these disputed facts in support of their qualified immunity defense, insofar as qualified immunity may be based upon a mistake of fact. [Filing No. 77 at 2.]  But the Court need not consider a potential mistake of fact because, as discussed above, even assuming the Individual Defendants heard a child's voice, qualified immunity does not shield them from liability.  Assuming that the Individual Defendants did not hear a child's voice, but mistakenly believed they did, would yield the same result.

in this Order, Mr. Shattuck is entitled to judgment as a matter of law on the issue of liability on all his claims, and therefore Defendants are not entitled to judgment in their favor.  Defendants' Cross-Motion for Summary Judgment is **DENIED** in its entirety.

## IV.
### CONCLUSION

Based on the foregoing, the Clerk is **DIRECTED** to update the docket to correct Ms. Hill's first name from "Ashley" to "Ashlea."  Mr. Shattuck's Motion for Leave to File Short Surreply Brief in Opposition to Defendants' Cross-Motion for Summary Judgment, [78], is **GRANTED** to the extent that the Court has considered the proposed surreply brief, [Filing No. 78-1], in resolving the summary judgment motions.

Mr. Shattuck's Motion for Partial Summary Judgment, [65], is **GRANTED IN PART** and **DENIED IN PART** as follows:

- The motion is **GRANTED** as to liability on Mr. Shattuck's Fourth Amendment claims against the Individual Defendants based on entering the Shattucks' home and remaining inside until the point when Mr. Shattuck initiated a conversation with the DCS Defendants in a separate room, and state law trespass and false imprisonment claims against the Sheriff;

- The motion is **GRANTED** to the extent that the Court **AWARDS $733.00 in damages** to Mr. Shattuck stemming from his Fourth Amendment illegal entry claim and state law trespass claim, for which **all Defendants are jointly and severally liable**;

- The motion is **GRANTED** to the extent that the Court concludes that the Vigo County Defendants' actions constitute crimes as specified herein for purposes of the CVRA; and

- The motion is **DENIED** to the extent that the Court cannot decide at this stage whether and to what extent exemplary damages under the CVRA are warranted.

Defendants' Cross-Motion for Summary Judgment, [71], is **DENIED** in its entirety.  The only issue remaining for resolution is the appropriate measure of additional damages, if any,

stemming from Mr. Shattuck's claims.  The Court requests that the Magistrate Judge confer with the parties regarding the possibility of resolving this issue short of trial.


Date: 2/9/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record**